**[ORAL ARGUMENT NOT YET SCHEDULED]**

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

PERKINS COIE LLP,
                              *Plaintiff-Appellee,*
v.
U.S. DEPARTMENT OF JUSTICE, *et al.*,
                              *Defendants-Appellant.*

————————————

JENNER & BLOCK LLP,
                              *Plaintiff-Appellee,*
v.
U.S. DEPARTMENT OF JUSTICE, *et al.*,
                              *Defendants-Appellant.*

————————————

WILMER CUTLER PICKERING HALE & DORR LLP,
                              *Plaintiff-Appellee,*
v.
EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,
                              *Defendants-Appellant.*

————————————

SUSMAN GODFREY LLP, et al.,
                              *Plaintiff-Appellee,*
v.
EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,
                              *Defendants-Appellant.*

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

**BRIEF FOR APPELLANTS**

————————————

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

ABHISHEK S. KAMBLI
  *Deputy Associate Attorney*
    *General*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-6993*
  *Abhishek.kambli@usdoj.gov*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

In case no. 25-5241, Plaintiff-Appellee is Perkins Coie LLP; Defendants-Appellants the U.S. Department of Justice, et al., are listed at Doc. 2128291, Ex. A (filed August 1, 2025) (listing 351 entities); amici curiae in the district court are listed at Doc. 2128291, Ex. B (filed August 1, 2025) (listing 37 entities).

In case no. 25-5265, Plaintiff-Appellee is Jenner & Block LLP; Defendants-Appellants the U.S. Department of Justice, et al., are listed at Doc. 2131319, Ex. A (filed August 21, 2025) (listing 48 entities); amici curiae in the district court are listed at Doc. 2131319, Ex. B (filed August 21, 2025) (listing 35 entities).

In case no. 25-5277, Plaintiff-Appellee is Wilmer Cutler Picking Hale & Dorr LLP; Defendants-Appellants the Executive Office of the President, et al., are listed at Doc. 2132227, Ex. A (filed August 27, 2025) (listing 52 entities); amici curiae in the district court are listed at Doc. 2132227, Ex. B (filed August 27, 2025) (listing 31 entities).

In case no. 25-5310, Plaintiff-Appellee is Susman Godfrey LLP; Defendants-Appellants the Executive Office of the President, et al., are listed at Doc. 2137099, Ex. A (filed September 25, 2025) (listing 353 entities); amici curiae at the district court are listed at Doc. 2137099, Ex. B (filed September 25, 2025) (listing 44 entities).

**B.    Rulings Under Review**

The following rulings are under review in these consolidated cases: (1) *Perkins*, No. 25-cv-716 (D.D.C.), by the Honorable Beryl A. Howell, dated May 2, 2025, granting plaintiff's motion for summary judgment and denying the Government's renewed motion to dismiss, and published at 783 F. Supp. 3d 105; (2) *Jenner & Block*, No. 25-cv-916 (D.D.C.), by the Honorable John D. Bates, dated May 23, 2025, granting plaintiff's motion for summary judgment and denying defendants' motion to dismiss, and published at 784 F. Supp. 3d 76; (3) *WilmerHale*, No. 25-cv-917 (D.D.C.), by the Honorable Richard J. Leon, dated May 27, 2025, granting in part and denying in part plaintiff's motion for summary judgment and defendants' motion to dismiss, and published at 784 F. Supp. 3d 127; and (4) *Susman Godfrey*, No. 25-1107 (D.D.C.), by the Honorable Loren L. AliKhan, dated June 27, 2025, and published at 789 F. Supp. 3d 15.

## C.    Related Cases

The following case is currently pending before the D.C. Circuit:

*Zaid v. Executive Office of the President*, No. 26-5009.


> */s/ Abhishek S. Kambli*
> ABHISHEK S. KAMBLI

# TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................... 1

STATEMENT OF JURISDICTION.......................................................... 5

STATEMENT OF THE ISSUES............................................................... 5

PERTINENT STATUTES AND REGULATIONS ................................... 6

STATEMENT OF THE CASE ................................................................. 6

    A.    Factual Background ................................................... 6

    B.    Procedural Background........................................... 14

SUMMARY OF ARGUMENT ............................................................... 17

STANDARD OF REVIEW..................................................................... 19

ARGUMENT .......................................................................................... 20

I.    Plaintiffs' Claims Challenging the President's Revocation of Their Security Clearances Are Not Justiciable. ........................... 20

II.    The District Courts Erred in Enjoining Section 4, Concerning Review of Discriminatory Employment Practices. .......................... 41

III.    The District Courts Erred in Enjoining Section 3, Concerning Contractors, and Section 5, Concerning Guidance on Access to Buildings. ..................... 48

IV.    The District Courts Erred in Finding Section 1 Non-Severable and Enjoining Future Actions....................... 60

CONCLUSION ....................................................................... 65

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                              **Page(s)**

*Abbott Lab'ys v. Gardner,*
387 U.S. 136 (1967), *abrogated on other grounds by*
*Califano v. Sanders*, 430 U.S. 99 (1977) ............................................... 49

*Am. Petrol. Inst. v. EPA,*
683 F.3d 382 (D.C. Cir. 2012) ............................................................... 49

*Amgen Inc. v. Smith,*
357 F.3d 103 (D.C. Cir. 2004) ............................................................... 33

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ............................................................................... 51

*Aref v. Lynch,*
833 F.3d 242 (D.C. Cir. 2016) ............................................................... 47

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020) ............................................................................... 63

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
529 U.S. 217 (2000) ............................................................................... 61

*Becerra v. Dalton,*
94 F.3d 145 (4th Cir. 1996) ........................................................... 24, 35

*Bennett v. Chertoff,*
425 F.3d 999 (D.C. Cir. 2005) ............................................................... 22

*Bill Johnson's Rests., Inc. v. NLRB,*
461 U.S. 731 (1983) ............................................................................... 54

*Bldg. & Constr. Trades Dep't v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ......................................................... 42, 43

*Brady v. Off. of Sergeant at Arms,*
520 F.3d 490 (D.C. Cir. 2008) ............................................................... 53

*Cause of Action Inst. v. U.S. Dep't of Just.,*
  330 F. Supp. 3d 336 (D.D.C. 2018)......................................................57

*Chennareddy v. Bowsher,*
  935 F.2d 315 (D.C. Cir. 1991)............................................................43

*Common Cause v. Trump,*
  506 F. Supp. 3d 39 (D.D.C. 2020)...............................................49, 50

*Contractors Ass'n of E. Pa. v. Sec'y of Lab.,*
  442 F.2d 159 (3d Cir. 1971)...............................................................53

*DCH Reg'l Med. Ctr. v. Azar,*
  925 F.3d 503 (D.C. Cir. 2019)............................................................33

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988) ...........................................................21, 22, 35

*El-Ganayni v. U.S. Dep't of Energy,*
  591 F.3d 176 (3d Cir. 2010)...............................................................36

*Foote v. Moniz,*
  751 F.3d 656 (D.C. Cir. 2014)......................................................25, 39

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ..........................................................................64

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ..........................................................................54

*Hill v. White,*
  321 F.3d 1334 (11th Cir. 2003) .........................................................25

*Hishon v. King & Spalding,*
  467 U.S. 69 (1984) ......................................................................53, 54

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) ..............................................................................58

*Hous. Cmty. Coll. Sys. v. Wilson*,
   595 U.S. 468 (2022) ............................................................... 47

*Johanns v. Livestock Mktg. Ass'n*,
   544 U.S. 550 (2005) ............................................................... 61

*Keller v. State Bar of Cal.*,
   496 U.S. 1 (1990) ................................................................... 61

*Lee v. Garland*,
   120 F.4th 880 (D.C. Cir. 2024) ......................... 23, 24, 26, 27, 29, 31, 34

*Matal v. Tam*,
   582 U.S. 218 (2017) ............................................................... 61

*Minn. State Bd. for Cmty. Colls. v. Knight*,
   465 U.S. 271 (1984) ............................................................. 58–59

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ............................................................... 51

*Myers v. United States*,
   272 U.S. 52 (1926) ................................................................. 43

*Nat'l Endowment of the Arts v. Finley*,
   524 U.S. 569 (1998) ............................................................... 61

*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
   983 F.2d 286 (D.C. Cir. 1993) ....................................... 27, 28, 35

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024) ............................................................... 63

*Norwood v. Harrison*,
   413 U.S. 455 (1973) ............................................................... 53

*N.Y. State Ophthalmological Soc'y v. Bowen*,
   854 F.2d 1379 (D.C. Cir. 1988) ............................................... 50

*O'Bannon v. Town Ct. Nursing Ctr.*,
447 U.S. 773 (1980) ............................................................... 55

*O'Donnel v. Barry*,
148 F.3d 1126 (D.C. Cir. 1998).............................................. 57

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ............................................................... 48

*Oryszak v. Sullivan*,
576 F.3d 522 (D.C. Cir. 2009).............................................. 23

*Palmieri v. United States*,
896 F.3d 579 (D.C. Cir. 2018)............................................... 23

*Perez v. FBI*,
71 F.3d 513 (5th Cir. 1995) ................................................... 24

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ..................................................... 61, 62–63

*Rattigan v. Holder*,
689 F.3d 764 (D.C. Cir. 2012)........................................ 38, 39

*Rattigan v. Holder*,
780 F.3d 413 (D.C. Cir. 2015)............................................... 39

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*,
547 U.S. 47 (2006) ................................................................. 54

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 (1990) ................................................................. 64

*Ryan v. Reno*,
168 F.3d 520 (D.C. Cir. 1999)............................... 22, 23, 34, 36–37

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ............................................................... 64

ix

*Shurtleff v. City of Boston,*
   596 U.S. 243 (2022) ............................................................... 62

*Sierra Club v. Costle,*
   657 F.2d 298 (D.C. Cir. 1981) ............................................... 43

*TikTok Inc. v. Garland,*
   604 U.S. 56 (2025) ................................................................. 55

*United States v. Regenerative Scis., LLC,*
   741 F.3d 1314 (D.C. Cir. 2014) ............................................. 19

*United States v. Salerno,*
   481 U.S. 739 (1987) ............................................................... 51

*Vill. of Willowbrook v. Olech,*
   528 U.S. 562 (2000) ............................................................... 58

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
   576 U.S. 200 (2015) ............................................................... 62

*Wheat v. United States,*
   486 U.S. 153 (1988) ............................................................... 59

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
   165 F.3d 43 (D.C. Cir. 1999) ................................................. 50

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) ................................................................... 62

**U.S. Constitution:**

Art. II, § 1 .................................................................................. 43

Amend. V .................................................................................... 55

**Statutes:**

28 U.S.C. § 1291 ......................................................................... 5

28 U.S.C. § 1331 ......................................................................... 5

42 U.S.C. § 2000e-4(e) ............................................................... 42

42 U.S.C. § 2000e-5 .................................................................... 44

42 U.S.C. § 2000e-5(a) ............................................................... 42

42 U.S.C. § 2000e-5(b) ......................................................... 42, 44

**Regulatory Materials:**

29 C.F.R. § 1601.11(a) ............................................................... 44

EO 12968, Access to Classified Information,
  60 Fed. Reg. 40245 (Aug. 7, 1995) ................................... 26–27

EO 14173, Ending Illegal Discrimination and Restoring Merit-Based
  Opportunity, 90 Fed. Reg. 8633 (Jan. 31, 2025) .................................... 47

EO 14230, Addressing Risks from Perkins Coie LLP,
  90 Fed. Reg. 11781 (Mar. 11, 2025) .......................... 6–7, 11, 12, 13, 14,
                                                      42, 51–52, 53, 54, 60

EO 14246, Addressing Risks from Jenner & Block,
  90 Fed. Reg. 13997 (Mar. 28, 2025) ..........7, 8, 11, 12, 13, 14, 54, 57, 60

EO 14250, Addressing Risks From WilmerHale,
  90 Fed. Reg. 14549 (Apr. 3, 2025) ................. 8, 9, 11, 12, 13, 14, 16, 60

EO 14263, Addressing Risks from Susman Godfrey,
  90 Fed. Reg. 15615 (Apr. 15, 2025) .......................... 9, 10, 11, 12, 13, 14

**Rule:**

Fed. R. Civ. P. 56(a) .................................................................... 19

**Other Authorities:**

EEOC,
  *President Appoints Andrea R. Lucas EEOC Acting Chair*
  (Jan. 21, 2025), https://www.eeoc.gov/newsroom/president-appoints-
  andrea-r-lucas-eeoc-acting-chair ........................................................ 48

Memorandum from Attorney General,
  Re: Ending Illegal DEI and DEIA Discrimination and Preferences
  (Feb. 5, 2025),
  https://www.justice.gov/ag/media/1388501/dl?inline............................ 48

2 Richard J. Pierce Jr.,
  *Administrative Law Treatise* (5th ed. 2010) ....................................... 56

*The Federalist* No. 72 ................................................................... 43

## GLOSSARY

| | |
|---|---|
| DOJ | Department of Justice |
| EEOC | Equal Employment Opportunity Commission |
| EO | Executive Order |
| Jenner | Jenner & Block LLP |
| OMB | Office of Management and Budget |
| Perkins | Perkins Coie LLP |
| Susman | Susman Godfrey LLP |
| WilmerHale | Wilmer Cutler Pickering Hale & Dorr LLP |

## INTRODUCTION

Courts cannot tell the President what to say.  Courts cannot tell the President what not to say.  They cannot tell the President how to handle national security clearances.  And they cannot interfere with Presidential directives instructing agencies to investigate racial discrimination that violates federal civil rights laws.  Nor can they interfere with Presidential directives instructing agencies to review contracts or regulate government building access based on those same racial-discrimination and national-security concerns—especially where such directives have not yet been implemented.

Ignoring those constraints, the district courts below bent over backwards to facially invalidate every section of four Executive Orders without considering their plainly constitutional aspects and applications.  This appeal of those sweeping decisions is not about the sanctity of the American law firm; it is about lower courts encroaching on the constitutional power of the President to discuss and address invidious racial discrimination, national security risks, and other problems with certain law firms.

In recognition of those problems, many law firms agreed to address their practices and commit to providing pro bono work in the public interest.[1]  These consolidated appeals concern four Executive Orders ("EOs") through which the President addressed risks from four other law firms: Perkins Coie LLP ("Perkins"), Jenner & Block LLP ("Jenner"), Wilmer Cutler Pickering Hale & Dorr LLP ("WilmerHale"), and Susman Godfrey LLP ("Susman").  The substantially similar EOs directed a review of plaintiffs to ensure that the Federal Government's dealings with them are consistent with our Nation's civil rights laws, national security, and other public interests.  In response, plaintiffs raised facial challenges under the First, Fifth, and Sixth Amendments.  Four district courts issued permanent injunctions against the four EOs.  That was error, because the EOs are well within the Presidential prerogative.

To begin, it was grave error for the district courts to enjoin Section 2 of the EOs, which directs agencies to "review" whether "active security clearances" held by plaintiffs' employees "are consistent with the national

---

[1] Allen Overy Shearman Sterling LLP; Cadwalader, Wickersham & Taft LLP; Kirkland & Ellis LLP; Latham & Watkins LLP; Milbank LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Simpson Thacher & Bartlett LLP; Skadden, Arps, Slate, Meagher & Flom LLP; and Wilkie Farr & Gallagher LLP.

2

interest." It is well established that courts may not police the President's adjudication of security clearance decisions. Such Presidential actions are plainly not justiciable. Further, plaintiffs have not and could not argue that their employees should enjoy unfettered security clearance privileges even if the President determines that such privileges are contrary to the national interest.

The district courts also erred with respect to Section 4 of the EOs, which merely requires the Equal Opportunity Commission ("EEOC") to review whether large law firms are in compliance with anti-discrimination laws—which the Commission is statutorily obligated to do anyway. Section 4 further directs the Attorney General, in coordination with the EEOC, to investigate such compliance. That sort of instruction is in the heartland of the President's discretion to set priorities for the enforcement of federal law.

There was no basis for the district courts to hold Sections 3 and 5 unconstitutional, either. Section 3 requires federal agencies to review government contracts and take any appropriate lawful steps to terminate contracts for which plaintiffs have been hired to perform services. And Section 5 requires federal agencies to provide guidance limiting access to

government buildings by plaintiffs' employees where such access would threaten national security or the interests of the United States. Neither Section has been implemented, so plaintiffs' abstract challenges to these instructions are not ripe. At any rate, Sections 3 and 5 do not violate the First Amendment because they are expressly motivated by plaintiffs' unprotected conduct (*e.g.*, race-based employment practices and hiring of persons who engaged in inappropriate conduct while working for the government, and related national security risks). Nor do Sections 3 and 5 violate the Fifth or Sixth Amendments. Among other reasons, they do not deprive plaintiffs of any cognizable liberty or property interest under the Due Process Clause. And they do not impose any cognizable burden on third parties' right to counsel.

Finally, even assuming that the district courts identified any justiciable constitutional problems with the EOs, the courts erred in treating Section 1's precatory language as non-severable and the basis for future injunctive relief. Section 1 of the EOs provides background discussing how certain law firms have taken actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, and undermine bedrock American

4

principles. This is simply the President's speech. Plaintiffs have no First Amendment right, and the Judiciary has no authority, to silence him. Yet several (but not all) of the district courts below purported to hold Section 1 unconstitutional. That too was error.

The Court should therefore reverse the district courts' orders granting plaintiffs' motions for summary judgment.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district courts' jurisdiction under 28 U.S.C. § 1331 because the causes of action pleaded arise under the Constitution and laws of the United States. The district courts entered final judgments on May 2, May 23, May 27, and July 29, 2025, in *Perkins*, *Jenner*, *WilmerHale*, and *Susman*, respectively. And the Government respectively filed timely notices of appeal on June 30, July 21, July 25, and August 22, 2025. This Court has jurisdiction over these appeals under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

1. Whether plaintiffs' constitutional challenges to Section 2 of the EOs, concerning the President's temporary suspension of security clearances and direction for further review, are justiciable;

2. Whether the district courts erred in finding unconstitutional Section 4 of the EOs, concerning the review and investigation of discriminatory employment practices by large law firms;

3. Whether the district courts erred in finding facially unconstitutional Sections 3 and 5 of the EOs, concerning the government's contracting practices and future guidance on building access; and

4. Whether three of the district courts erred in finding unconstitutional and non-severable Section 1 of the EOs, which contains only precatory language.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Factual Background

1.    On March 6, 2025, President Trump issued EO 14230, Addressing Risks from Perkins Coie LLP, 90 Fed. Reg. 11781 (Mar. 11,

6

2025). The EO recounted the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including its "egregious activity" of "hir[ing] Fusion GPS, which then manufactured a false 'dossier' designed to steal an election." *Id.* §1. Perkins has also "worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification," and "[i]n one such case, a court was forced to sanction Perkins Coie attorneys for an unethical lack of candor before the court." *Id.* Further, Perkins "racially discriminates against its own attorneys and staff, and against applicants." *Id.* The EO clarified that the President's "Administration is committed to ending discrimination under 'diversity, equity, and inclusion' policies and ensuring that Federal benefits support the laws and policies of the United States." *Id.* In addition, "[t]hose who engage in blatant race-based and sex-based discrimination" shows a "disrespect for the bedrock principle of equality" that "represents good cause to conclude that they neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds." *Id.*

2.    On March 25, 2025, the President issued EO 14246, Addressing Risks from Jenner & Block, 90 Fed. Reg. 13997 (Mar. 28, 2025).   This EO reaffirmed that the President's "Administration is committed to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests."   *Id.* §1.   It identified Jenner as "yet another law firm that has abandoned the profession's highest ideals, condoned partisan 'lawfare,' and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States."   *Id.*   In particular, "Jenner engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."   *Id.*   Further, "Jenner discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'"   *Id.*   Finally, Jenner "re-hire[d] the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified

investigation," despite the fact that Weissmann's "career has been rooted in weaponized government and abuse of power." *Id.*

3.    On March 27, 2025, the President issued EO 14250, Addressing Risks From WilmerHale, 90 Fed. Reg. 14549 (Apr. 3, 2025). This EO explained that "WilmerHale engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote." *Id.* §1.  Further, "WilmerHale itself discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'" *Id.* And "WilmerHale is also bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice," such as by "reward[ing] Robert Mueller and his colleagues—Aaron Zebley, Mueller's 'top aide' and 'closest associate,' and James Quarles— by welcoming them to the firm after they wielded the power of the

Federal Government to lead one of the most partisan investigations in American history." *Id.*

4.    On April 9, 2025, the President issued EO 14263, Addressing Risks from Susman Godfrey, 90 Fed. Reg. 15615 (Apr. 15, 2025). This EO explained the need for action "to address the significant risks, egregious conduct, and conflicts of interest associated with Susman." *Id.* §1. "Susman spearheads efforts to weaponize the American legal system and degrade the quality of American elections." *Id.* "Susman also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology, and it supports efforts to discriminate on the basis of race." *Id.* Finally, "Susman itself engages in unlawful discrimination, including discrimination on the basis of race" and even "administers a program where it offers financial awards and employment opportunities only to 'students of color.'" *Id.*

5.    The President determined that it was necessary to take action to address the significant risks, egregious conduct, and conflicts of interest described as to each plaintiff. *Id.* The substance of the four EOs was identical. For each, Section 2 provided for security clearance review:

10

(a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Perkins Coie. The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Perkins EO, § 2; *accord* Jenner EO, § 2; WilmerHale EO, § 2; Susman EO, § 2.

For each EO, Section 3 addressed contracting:

(a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract.

(b) The heads of all agencies shall review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

11

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Perkins Coie has been hired to perform any service; (ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Perkins Coie or with entities that do business with Perkins Coie effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Perkins EO, § 3; *accord* Jenner EO, § 3; WilmerHale EO, § 3; Susman EO, § 3.

Section 4 of each EO addressed racial discrimination. Section 4 of the Perkins EO provided:

(a) The Chair of the Equal Employment Opportunity Commission shall review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis.

(b) The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in

12

consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered.

Section 4 of the other three EOs cross-referenced Section 4 of the Perkins EO and clarified that "[n]othing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)."  Jenner EO, § 4; WilmerHale EO, § 4; Susman EO, § 4.

Section 5 of each EO addressed building access and personnel:

(a) The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

13

Perkins EO, § 5; *accord* Jenner EO, § 5; WilmerHale EO, § 5; Susman EO, § 5.

Finally, Section 6 included general provisions requiring, among other things, that the EOs "shall be implemented consistent with applicable law." Perkins EO, § 6; Jenner EO, § 6; WilmerHale EO, § 6; Susman EO, § 6.

6. The President also issued (or considered issuing) EOs addressing risks and practices from other law firms not parties to this appeal. In fact, many law firms agreed to address their practices and commit to providing pro bono work in the public interest: Allen Overy Shearman Sterling LLP; Cadwalader, Wickersham & Taft LLP; Kirkland & Ellis LLP; Latham & Watkins LLP; Milbank LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Simpson Thacher & Bartlett LLP; Skadden, Arps, Slate, Meagher & Flom LLP; and Wilkie Farr & Gallagher LLP. The four plaintiff law firms instead filed suit.

## B.    Procedural Background

1. Perkins filed its complaint on March 11, 2025, alleging that its EO was ultra vires (Count I) and violated the Fifth Amendment (Count II–IV, IX), First Amendment (Count V–VII), and Sixth Amendment

(Count VIII). JA60–77. On May 2, 2025, the district court issued a memorandum opinion, JA1628–1729, and order granting plaintiff's motion for summary judgment and declaratory and permanent injunctive relief. JA1623–27. On June 30, 2025, defendants timely filed a notice of appeal. JA1730.

2. Jenner filed its complaint on March 28, 2025, alleging that its EO violated the First Amendment (Counts I–VI), the Fifth Amendment (Counts VII–X, XII), the Sixth Amendment (Count X), and separation of powers (Count XIII). JA1799–1821. On May 23, 2025, the district court issued a memorandum opinion, JA2157–2208, and order granting plaintiff's motion for summary judgment and permanent injunction and denying defendants' motion to dismiss. JA2209–13. The court clarified that its order did "not enjoin future actions taken pursuant to Section 1" of the EO. JA2205. Defendants timely filed a notice of appeal on July 21, 2025. JA2240.

3. WilmerHale filed its complaint on March 28, 2025, alleging that its EO violated the First Amendment (Counts I–IV), separation of powers (Count V), the Fifth Amendment (Counts VI–IX), the Sixth Amendment (Count X), and the spending power (Count VI). JA2305–28. On May 27,

15

2025, the district court issued a memorandum opinion, JA2804–76, and order granting in part and denying in part plaintiff's motion for summary judgment. JA2877–79. Specifically, the order granted relief on Counts I through VII and X but denied as moot Counts VIII, IX, and XI. JA2877. The court declared that the WilmerHale EO violated "the First, Fifth, and Sixth Amendments" and permanently enjoined defendants "from implementing or giving effect" to it, "including by relying on or considering any of the statements in § 1 of" the order. JA2878. On July 25, 2025, defendants timely filed their notice of appeal. JA2892.

4. Susman filed its original complaint on April 11, 2025. *Cf.* JA3362–3481 (amended complaint). On June 27, 2025, the district court issued a memorandum opinion, JA3482–3534, and order denying defendants' motion to dismiss, granting plaintiff's motion for summary judgment, and entering judgment for plaintiffs on Counts I through IV and VI through IX of the amended complaint, and granting plaintiff declaratory and permanent injunctive relief. JA3535–39. Defendants timely filed their notice of appeal on August 22, 2025. JA3541.

16

## SUMMARY OF ARGUMENT

**I.**    Plaintiffs' claims challenging the President's revocation of security clearances are not justiciable.  The Supreme Court and this Court have made clear that claims challenging Presidential directives concerning security clearance reviews—whether styled as constitutional, statutory, or process-based claims—are not justiciable.  In any event, plaintiffs cannot cast their claims as merely asserting a lack of process because, for relief, they sought the restoration of security clearances (rather than more process).  And the district courts improperly granted that relief based primarily on the underlying merits of the security clearance determinations.  The district courts even enjoined the security clearance *review* provisions of the EO, which could not possibly give rise to any process-related defect.

**II.**    The district courts erred in enjoining Section 4 of the EOs, concerning review of discriminatory employment practices, without clearly explaining why.  This section merely directs the EEOC to review and the Attorney General to investigate invidious (and illegal) discrimination by large law firms.  Plaintiffs lack standing to raise a pre-enforcement challenge based on Section 4, especially given that the EO

17

just directed the EEOC to review the employment practices of large law firms generally, without requiring enforcement against any particular entity. The same logic applies to Section 4's instructions to DOJ. Plaintiffs cannot establish retaliation where rooting out unlawful discrimination has been an EEOC and DOJ priority since well before the EOs were released.

III. The district courts erred in enjoining Section 3, concerning contractors, and Section 5, concerning guidance on access to buildings. Plaintiffs' challenges are unripe because Sections 3 and 5 have not yet been implemented. And plaintiffs cannot demonstrate that these sections are facially unconstitutional. Contrary to the opinions below, Sections 3 and 5 do not constitute impermissible retaliation or viewpoint discrimination because they are expressly motivated by non-protected conduct. Nor does plaintiffs' kitchen sink of other constitutional theories justify facially invalidating these sections. Sections 3 and 5 (and the EOs more generally) do not deprive plaintiffs of "life, liberty, or property" within the meaning of the Due Process Clause; do not violate the Equal Protection Clause; are not void for vagueness; do not run afoul any Fifth

18

or Sixth Amendment right-to-counsel guarantees; and do not otherwise violate the Constitution or the separation of powers.

**IV.**   Finally, the district courts erred in finding Section 1 non-severable and enjoining future actions.  As one district court correctly recognized, Section 1 is simply government speech, and it would be improper to grant a permanent injunction against every future hypothetical action based on Section 1.  In any event, the EOs' individual sections are severable.

## STANDARD OF REVIEW

This Court will "review the grant of summary judgment . . . de novo . . . affirming only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1318 (D.C. Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  This Court will "review the district court's entry of a permanent injunction for abuse of discretion and its factual findings for clear error."  *Id.*

19

## ARGUMENT

## I.    Plaintiffs' Claims Challenging the President's Revocation of Their Security Clearances Are Not Justiciable.

Plaintiffs' challenges to Section 2 of the EOs are not justiciable because plaintiffs are seeking the restoration of their security clearances, not just more process. In fact, the district courts in this case took the step of reversing any suspension of active security clearances and enjoining even any clearance *review* made pursuant to the EOs. JA1623–27 (*Perkins*), 2209–12 (*Jenner*), 2877–79 (*WilmerHale*), 3535–39 (*Susman*). This type of remedy is plainly foreclosed. The provisions at issue direct the heads of Executive Branch agencies to "take steps consistent with applicable law to suspend any active security clearances held by individuals" at plaintiff firms "pending a review of whether such clearances are consistent with the national interest." The President thus personally adjudicated the merits of suspending these individuals' access to national security information, during the interim period when their clearances were subject to further review. The Supreme Court and this Court have made clear that such actions are not justiciable.

20

a. In *Department of Navy v. Egan*, the Supreme Court held that outside, non-expert bodies cannot review Executive Branch judgments about whether specific individuals pose a risk to national security. 484 U.S. 518 (1988). Grounding that rule in separation-of-powers concerns, the Court emphasized that the duty to control access to classified information rests with the Executive Branch agency responsible for the information and derives from the President's authority under Article II of the Constitution. *Id.* at 527–29. The Court stressed that such determinations are an "inexact science," involving the exercise of "[p]redictive judgment" about security risks that "must be made by those with the necessary expertise in protecting classified information," and held that such judgments are "committed to the broad discretion of the agency responsible." *Id.* at 529. As the Court summarized, "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* "Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk." *Id.*

21

Applying *Egan*, this Court has repeatedly held that federal courts may not adjudicate claims that would require a factfinder to second-guess the merits of an Executive Branch agency's denial of a security clearance or similar decisions. This is the case for all such challenges, whether styled as statutory, constitutional, or process-based. For example, in *Ryan v. Reno*, this Court held that *Egan* precluded Title VII claims challenging a decision by the Immigration and Naturalization Service refusing to waive background checks for foreign nationals seeking federal employment because "the waiver denials were tantamount to clearance denials and were based on the same sort of 'predictive judgment' that *Egan* tells us 'must be made by those with the necessary expertise in protecting classified information,' without interference from the courts." 168 F.3d 520, 524 (D.C. Cir. 1999) (quoting *Egan*, 484 U.S. at 529).

Likewise, in *Bennett v. Chertoff*, this Court held that "employment actions based on denial of security clearance are not subject to judicial review, including under Title VII." 425 F.3d 999, 1001 (D.C. Cir. 2005). In recognition of the need to give the Executive Branch meaningful latitude to safeguard sensitive information, this Court held that *Egan* precludes review of not only the formal denial or revocation of a security

22

clearance, but also any related claim that would require a "trier of fact . . . to consider the merits of" a security determination. *Id.* at 1000. Along the same lines, in *Oryszak v. Sullivan*, this Court affirmed the dismissal of a claim brought by a Secret Service employee challenging the revocation of her security clearance under the Administrative Procedure Act. 576 F.3d 522 (D.C. Cir. 2009). Relying on *Ryan*, *Bennett*, and *Egan* itself, this Court explained that "actions based upon denial of security clearance are committed to agency discretion by law." *Id.* at 526.

Finally, this Court recently held that *Egan* precludes judicial review of constitutional claims challenging the denial or revocation of a security clearance because "the Constitution commits that decision to the Executive." *Lee v. Garland*, 120 F.4th 880, 891 (D.C. Cir. 2024). Having previously reserved the question whether *Egan* bars review of constitutional claims in several prior cases, *see, e.g.*, *Ryan*, 168 F.3d at 524; *Palmieri v. United States*, 896 F.3d 579, 590 (D.C. Cir. 2018), the Court undertook a comprehensive analysis and grounded its conclusion that plaintiff's claims were non-justiciable in the political question doctrine. *Lee*, 120 F.4th at 891.

23

Significantly, *Lee* expressly rejected a First Amendment and Fifth Amendment challenge to the withdrawal of a security clearance as non-justiciable.     As to his due process claim, Lee alleged "that the . . . revocation decision rested on pretextual and untrue statements . . . and that the revocation harmed his reputation and future job prospects." 120 F.4th at 894.  As to his First Amendment claim, Lee alleged that his security clearance was revoked in "retaliation for [his] assertedly protected speech to media outlets." *Id.* at 895.  But because the claims "rest[ed] on injuries arising from the revocation and challenge[d] its substantive basis," they were "barred by *Egan*." *Id.*

Other courts of appeals have similarly held that *Egan* bars judicial review of claims challenging security clearance revocations because any inquiry "would of necessity require some judicial scrutiny of the merits of the revocation decision." *Perez v. FBI*, 71 F.3d 513, 514 (5th Cir. 1995).  Courts have also repeatedly rejected attempts by plaintiffs to circumvent *Egan* by purporting to challenge the process used to make security clearance determinations, including the adequacy or propriety of investigations leading to the denial or revocation of a security clearance. *See, e.g.*, *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996) ("[T]he

24

distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference[.]"); *Hill v. White*, 321 F.3d 1334, 1336 (11th Cir. 2003) ("To review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized.").

This Court has also held that *Egan* is not limited solely to security clearance decisions, but also bars claims challenging other types of security-related decisions. Thus, in *Foote v. Moniz*, this Court held that *Egan* foreclosed a claim of race discrimination brought by a Department of Energy employee challenging his termination after the agency revoked his certification to work around nuclear materials. 751 F.3d 656, 659 (D.C. Cir. 2014). The Court reasoned that determinations about who should be cleared to have access to nuclear weapons and materials involve the same types of predictive judgments as security clearance decisions and are thus not subject to review under *Egan*. *Id.*

b. Taken as whole, binding precedent makes clear that plaintiffs' challenge to the President's suspension of security clearances pending further review is non-justiciable. *Lee* helps show why. There, the plaintiff—an FBI employee for ten years—failed two polygraph exams

25

and subsequently had his security clearance revoked. 120 F.4th at 884–85. In Lee's telling, that revocation was unlawful because it "rested on a pretextual justification and harmed his reputation and employment prospects." *Id.* at 885. Lee also claimed that the underlying polygraph exams were "tainted by unlawful discrimination and retaliation" against Lee's exercise of his First Amendment rights, and that he did not receive adequate process because the reviewer "fail[ed] to investigate the cause of his failed polygraph exams." *Id.* He thus brought claims that the revocation of his security clearance "was based on race, national origin and protected speech" in violation of the First Amendment, the Fifth Amendment, and Title VII. *Id.* at 883.

In holding that Lee's claims were non-justiciable under *Egan*, this Court made a number of observations that apply equally to plaintiffs' claims here. First, the Court emphasized that adjudicating Lee's constitutional challenges would present "unmanageable questions." *Id.* at 893. Clearance decisions, after all, "involve an assessment of intangible qualities such as 'loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment.'" *Id.* (quoting EO 12968, Access to Classified Information, 60

Fed. Reg. 40245 (Aug. 7, 1995)).  The "predictive judgment[s]" and "inexact science" implicated by those decisions "defy judicial application." *Id.*

Second, *Lee* distinguished *National Federation of Federal Employees v. Greenberg*, 983 F.2d 286 (D.C. Cir. 1993), and rejected plaintiff's contention that it broadly authorized process-based challenges to security clearance determinations.  As the Court explained, *Greenberg* "allowed judicial review of (but rejected on the merits) claims that the Fifth Amendment prohibited asking clearance applicants about their use of illegal drugs or their mental health."  *Lee*, 120 F.4th at 892.  But the *Greenberg* plaintiffs' challenge to those questions and procedures did not arise in the context of any particular security clearance determination or seek the granting or reinstating of security clearances.  The individual plaintiffs all held active security clearances, and they sued alongside unions representing federal employees to seek only prospective injunctive relief as "agency employees likely to be asked those questions in future clearance adjudications."  *Id.*  Their injuries "existed regardless of how the government might have resolved any particular application." *Id.* at 893.  As *Lee* explained, this Court had "stressed that the *Greenberg*

27

plaintiffs did not seek review of 'discretionary judgments' regarding the merits of any 'particular employee's security clearance.'" *Id.* at 893 (quoting *Greenberg*, 983 F.2d at 290).

Unlike the plaintiffs in *Greenberg*, plaintiffs here directly challenge the suspensions/revocations of security clearances. They specifically requested—and the district courts granted—relief that directed the federal government to reverse any suspension or revocation. JA1623–27 (*Perkins*), 2209–12 (*Jenner*), 2877–79 (*WilmerHale*),[2] 3535–39 (*Susman*). *Lee* makes clear that plaintiffs cannot circumvent *Egan*'s bar by pretending that their claims do not challenge the merits of the President's decision. As in *Lee*, plaintiffs argue that they did not receive enough process. *See, e.g.*, JA2831 ("WilmerHale challenges the President's process—or lack thereof—in suspending the firm's employees' security clearances."). But they also claim that any reference to national security is pretextual and that the suspensions were done to retaliate against constitutionally protected activity. *See e.g.*, JA73 ("Section 1 of the Order falsely asserts that Perkins Coie, by espousing views

---

[2] While the *WilmerHale* order did not explicitly state the same remedies as the other district courts, the effect is still the same as it permanently enjoined the entire EO. JA2887–88.

supportive of diversity and inclusion, has 'disrespect[ed] . . . the bedrock principle of equality' and concludes that good cause therefore exists to terminate Perkins Coie's national security clearances and access to any federal funds.  Such allegations are bad faith, pretextual, and lack any basis in fact.").  Plaintiffs' complaints thus expressly invite judicial second-guessing of the President's security clearance determinations. They also invite the district court to evaluate whether the purpose of the revocation decision was to retaliate against constitutionally protected activity.  Precedent requires rejecting these invitations.

In sum, plaintiffs' complaints make clear that they want the courts to opine on "whether Executive Branch officials had good enough reasons to revoke" or suspend their clearances.  *Lee*, 120 F.4th at 895.  But *Egan* forecloses this sort of judicial second-guessing of security clearance determinations.  Put simply, "[t]he Constitution commits the question whether to deny or revoke a security clearance to the Executive Branch." *Id.* at 891.  Neither plaintiffs nor the district courts have identified any plausible basis for reaching a different conclusion in this case.

c.  The district courts barely paid lip service to the separation-of-powers issues that make these reviews non-justiciable and instead

focused on irrelevant distinctions within the case law.  For instance, in *Susman* the court held that "Susman's alleged constitutional injuries exist independent of any final decision on whether to reinstate any individual employee's security clearance." JA3499–3500.  But in the very next sentence the court stated that "Susman is not seeking to review any discretionary judgment about an individual security clearance but is instead raising a constitutional challenge to President Trump's blanket policy of *revoking all its employees' clearances.*"  JA3500 (emphasis added).  This is a distinction without a difference. Either way, the court is addressing a substantive decision by the President to suspend or revoke security clearances.

The rest of the lower court orders are equally problematic.  For example, in *Jenner*, the court stated that "[r]eviewing this process raises none of the concerns that make individual security-clearance determinations nonjusticiable.  The immediate and blanket *suspension involves no predictive judgment[s] about an individual['s] threat to national security.*" JA2178 (emphasis added).  In *WilmerHale*, the court relied primarily on "the President's process—or lack thereof—in suspending the firm's employees' security clearances" and stated that

"the Order does not invoke the national security concerns which barred judicial review of the security clearance revocation in *Lee*." JA2831. Finally, in *Perkins*, the court relied on (1) its review of "general policy" rather than "any individual security clearance decision, (2) that the plaintiff's challenge "would not require a court to wade into the issues animating the decision in *Lee*," (3) that the decision here was not made by "expert agency examiners," and (4) the lack of the explicit use of the words "national security" in Section 2. JA1666–67.

None of these rationales overcome the binding precedent that demonstrates these actions by the President are not reviewable—and in some instances the rationales directly transgress that precedent. *Lee* did not distinguish whether a merits adjudication affected one person or multiple. And *Lee*'s rationale applies equally to policies concerning clearances. 120 F.4th at 888–95 (explaining textual commitment to Executive Branch and lack of judicially manageable standards). Whether a security-clearance decision applies to one or many, someone has to weigh the risks and benefits of allowing plaintiffs' employees to access national security information pending further review. Here, the President (whose prerogative in this area obviously far exceeds that of

31

"expert agency examiners") made that determination.  Courts are not well positioned to second-guess the President's determinations.

The orders on relief remove any doubt that all the district court decisions were ultimately focused on the substance of the President's security clearance determinations.  The district courts did not order the President to, for instance, conduct an individualized review before suspending or revoking any security clearance.  Instead, they required immediate restoration of any security clearance revocation or suspension pursuant to the EOs.  JA1623–27 (*Perkins*); JA2209–12 (*Jenner*); JA2877–79 (*WilmerHale*); JA3535–39 (*Susman*).  In fact, in three of the four cases, the district courts even required defendants "to cease any security clearance review, made pursuant to Sections 1 or 2(a) of Executive Order 14230."  JA1625 (*Perkins*); JA2210 (*Jenner*); JA3538 (*Susman*).[3]  The case cannot possibly be about the process or lack of individual review when the orders require ceasing even the security clearance reviews themselves.  How the courts framed their reasoning hardly matters given that they ultimately overrode the President's

---

[3] While the *WilmerHale* order did not explicitly state the same remedies as the other district courts, the effect is still the same as it permanently enjoined the entire EO.  JA2887–88.

decision on the suspensions and revocations and thus intruded on his authority to control access to classified information.

Even if plaintiffs' claims did challenge the "means" of revoking their clearances and not the substance of the President's security clearance determinations, their claims would still be barred under *Egan* and *Lee*, and the district courts fundamentally erred in concluding otherwise. In the context of these cases, the difference between the method and the substance of the revocation is illusory. This Court and others have long recognized that claims challenging the *process* by which security clearances are revoked, such as challenges to the sufficiency of security investigations, are barred under *Egan* so long as they arise in the context of clearance adjudications or the relief sought would set aside the revocation of a security clearance.

It is well settled that, when an administrative decision is unreviewable, a court "may not inquire" whether it is "procedurally defective" either. *Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004). If it were otherwise, "almost any challenge to an [unreviewable determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506 (D.C. Cir.

2019).  The same goes for security-clearance decisions.  Any claim of inadequate process ultimately hinges on "what constitutes an acceptable margin of error in assessing the potential risk of granting or renewing a clearance."  *Lee*, 120 F.4th at 894 (internal quotation marks omitted).  That sort of determination belongs exclusively to the Executive Branch.

This Court's precedents have thus consistently rejected process-based challenges to security-clearance decisions.  In *Ryan*, for example, this Court rejected plaintiffs' attempt to "circumvent *Egan* by characterizing the challenged employment actions as procedural, divorced from any substantive security determination."  168 F.3d at 524.  And in *Lee*, whether officials should have "investigate[d] further" or whether they should have used better polygraph methods all went to "whether Executive Branch officials had good enough reasons to revoke" a clearance—a decision far outside the judicial role.  *Lee*, 120 F.4th at 894.  As explained above, *Greenberg* allowed a claim that sought prospective relief concerning the questions that might be asked in future clearance investigations—not one that sought retrospective relief seeking to reverse a security clearance decision based on alleged defects in the process used to make that determination.  *See id.* at 892–93.  Indeed, as

34

to the latter type of claim—at issue here—*Greenberg* itself reaffirmed that "[t]he President has unlimited and judicially unreviewable constitutional power to determine" who "will be given access to the nation's secrets." 983 F.2d at 290.

Other courts have also rejected attempts to challenge security-clearance determinations by objecting to the processes used. In *Dalton*, for example, the Fourth Circuit rejected a plaintiff's attempt to challenge the initiation of an investigation that ultimately led to the revocation of the plaintiff's clearance. 94 F.3d at 149. The court explained that "the distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference," and the "question of whether the Navy had sufficient reasons to investigate the plaintiff as a potential security risk goes to the very heart of the 'protection of classified information [that] must be committed to the broad discretion of the agency responsible.'" *Id.* (quoting *Egan*, 484 U.S. at 529) (alteration in original). Similarly, in *El-Ganayni v. United States Department of Energy*, the Third Circuit held that claims alleging that constitutional violations occurred in the process of revoking a plaintiff's security clearance should be dismissed for failure to state a claim upon

35

which relief can be granted because review of those claims "would inevitably involve scrutiny of the merits of the [agency's] decision to revoke [the plaintiff's] clearance"—an inquiry that "*Egan* forbids." 591 F.3d 176, 186 (3d Cir. 2010).

The district courts' own descriptions of plaintiffs' claims demonstrates the lack of any meaningful distinction between a challenge to the process of a clearance revocation and a challenge to the revocation itself, and the danger of reviewing any purported process claims in the context of a particular adjudication. For example, in *WilmerHale*, the court stated: "the alleged constitutional injuries include the lack of individualized review (in violation of the Due Process Clause), and the targeting of WilmerHale employees for suspension as a form of retaliation for protected speech (in violation of the First Amendment)." JA2831. But there is plainly no way to determine whether the process of revoking a plaintiff's clearance was "a form of retaliation" and whether it involved an adequately "individualized review" without inquiring into the process that was afforded and second-guessing the conclusions reached during that process. As this Court recognized in *Ryan*, a court cannot review the adequacy of a process "without also challenging its

36

validity." 168 F.3d at 524. In short, plaintiffs' claims would require the district court to consider whether the process that was afforded was adequate to sustain the revocation of their security clearances, and adjudicating such a claim would require the district court to review the merits of the President's revocation determination, which "run[s] smack up against *Egan*." *Id*.

Indeed, in concluding that the law firms' cases were justiciable each district court focused on the lack of an individualized determination. JA1667; JA2178; JA2829; JA3513. But to make that finding, the courts necessarily probed the reasons for the revocation of plaintiffs' clearances and evaluated their sufficiency—determinations that are committed to the discretion of the Executive Branch and for which there are no judicially manageable standards.

The district courts' analysis of the merits of plaintiffs' claims underscores the error in their *Egan* analysis. For example, in *Perkins*, the district court held, "[t]he record demonstrates that retaliation is the only plausible motive for the '*Security Clearance Review*' ordered in Section 2." JA1691. In *WilmerHale*, the district court held, "The Order goes on to impose a kitchen sink of *severe* sanctions on WilmerHale for

this protected conduct . . . it suspends WilmerHale employees' security clearances, with a looming threat of full revocation of those clearances. WilmerHale Order § 2(a)." JA2835 (emphasis in original). In *Jenner*, the district court held, "there's no doubt that the President ordered the Jenner-specific process in retaliation for Jenner's protected speech." JA2179. And in *Susman*, the district court held, "[t]he presence of nearly identical clauses in several executive orders targeting other law firms further confirms that the security-clearance provision is intended as a retaliatory measure." JA3512 (footnote omitted). All of these statements second-guess the merits of the President's determinations rather than any ancillary process.

The *Jenner* and *Perkins* district courts' reliance on *Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012), JA1666–67; JA2177–79, is just as flawed as any reliance on *Greenberg*. *Rattigan* likewise was a case where the plaintiff sought relief only against a collateral aspect of the clearance process, without seeking to set aside any clearance decision. In particular, *Rattigan* concerned allegations that "FBI officials retaliated" against an employee "in violation of Title VII" by "reporting unfounded security concerns to the Bureau's Security Division," which "prompted an

38

investigation into [the plaintiff's] continued eligibility for a security clearance." 689 F.3d at 765. The D.C. Circuit "held that *Egan*'s bar on judicial review extends only to security clearance-related decisions made by the Security Division itself *and not to decisions by other FBI employees to report their concerns to the Division*." *Id.* at 767 (emphasis added).[4] The Court thus created only a narrow opening for a plaintiff to establish liability based on the actions of an employee *not* involved in the security clearance determination (based on that employee knowingly reporting false information that results in a security clearance investigation). *Id.* at 770. And in applying *Rattigan*, the D.C. Circuit has consistently looked to whether the relevant actor was "within the category of individuals authorized under *Rattigan* to make a judgment" call about an individual's suitability to access classified information. *Foote*, 751 F.3d at 659 (holding that agency psychologist fell within this category).

These cases are unlike *Rattigan* in every relevant way. Most importantly, plaintiffs challenge the suspensions/revocation of security

---

[4] Upon a motion for reconsideration, the panel narrowed its holding to only permit judicial review of "Title VII claims based on knowingly false reporting." 689 F.3d at 770. The plaintiff was ultimately unable to make this showing. *Rattigan v. Holder*, 780 F.3d 413 (D.C. Cir. 2015).

clearances.  Plaintiffs do not challenge the actions of government officials or employees *outside* the security clearance process; instead, they challenge the actions of officials specifically charged with making security clearance determinations, including the President, who made the determination to suspend security clearances pending further review.

As a matter of both law and fact, the President is the ultimate arbiter of who may have access to classified information.  Article II vests the President with discretion over whether to entrust plaintiffs with access to classified information, and the President directly exercised this authority through the respective EOs.

Finally, to the extent the district courts relied on the fact that Section 2 of the EOs did not say the magic words "national security," JA1688, Section 1 and the rest of the EOs repeatedly speak of national security concerns.  Regardless, "magic words" (or lack thereof) should not determine whether courts can review national security decisions that this Court has already ruled are not justiciable.

## II.  The District Courts Erred in Enjoining Section 4, Concerning Review of Discriminatory Employment Practices.

Section 4 is mostly an afterthought in the district courts' analysis, to the point that it is difficult to identify the district courts' reasoning. For example, in the *WilmerHale* case, the court stated that "§ 4 targets WilmerHale for investigation by the EEOC and the Attorney General . . . This is the President, in essence, wielding investigative and prosecutorial powers of the State to punish and suppress WilmerHale's advocacy."  JA2839.  Beyond that there is little analysis of Section 4 in the *WilmerHale* order.  The rest of the district court opinions are similar. But when viewed in its proper context, there is nothing unlawful about Section 4.

Section 4 of the EOs directs the EEOC and Attorney General to investigate invidious discrimination by large law firms generally.  The district courts erred in interpreting Section 4 as a command for the EEOC to investigate firms outside of the usual EEOC process.  In fact, the EOs provide that the EEOC should review their practices while the DOJ, in coordination with the EEOC, investigates any law firm that does business with federal entities for compliance with existing anti-

discrimination laws.  Given that plaintiffs brought a facial challenge to the EOs, and that each of them contains a clause (Section 6(b)) directing that they be implemented "consistent with applicable law," the EOs should be upheld if there is a constitutional way to read and apply them. *See Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

Section 4 merely references the "review" and "investigat[ion]" of "the practices of representative large, influential, or industry leading law firms" for consistency with the civil rights laws.  Perkins EO, § 4.  That is *already* what the EEOC is supposed to be doing.  Congress empowered the EEOC "to prevent any person from engaging in any unlawful employment practice" under the civil rights laws.  42 U.S.C. § 2000e-5(a).  Congress also already requires the EEOC to make "report[s] . . . to the President . . . on the cause of and means of eliminating discrimination," including in any industry the President directs the EEOC to review.  *Id.* § 2000e-4(e).  Further, members of the EEOC are already statutorily authorized to file charges against "employer[s] . . . engaged in an unlawful employment practice."  *Id.* § 2000e-5(b).  In other words, even if

42

the President never issued the EOs, plaintiffs would still be subject to inquiries by the EEOC—just like any other employer in the country.

But the district courts discounted that logic, finding the President's investigative direction to the EEOC problematic and supported by "no authority." JA1674.  The Constitution says otherwise.  All "executive Power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1.  That necessarily includes the President's "general administrative control of those executing the laws." *Myers v. United States*, 272 U.S. 52, 164 (1926); *see also Sierra Club v. Costle,* 657 F.2d 298, 406 n. 524 (D.C. Cir. 1981).  Providing direction, "guidance[,] and supervision to his subordinates" is part and parcel of the "faithful execution of the laws enacted by Congress." *Allbaugh*, 295 F.3d at 32. And the Executive's subordinates are "duty-bound" to abide by his direction.  *Id.* ("[O]fficers are duty-bound to give effect to the policies embodied in the President's direction, to the extent allowed by the law."); *The Federalist* No. 72, at 487 (explaining federal officers and agencies will be "subject to [the President's] superintendence").  The EEOC is such an "executive branch agency." *Chennareddy v. Bowsher*, 935 F.2d 315, 318 (D.C. Cir. 1991).  Thus, there is nothing untoward, much less

43

unlawful, about the EOs directing the EEOC in the exercise of their applicable statutory duties.

The concerns that at least one court had regarding letters sent to law firms, and the supposed necessity of specific enforcement charges, are unfounded. JA1626. The EEOC is responsible for enforcing Title VII with respect to, among other covered entities, private sector employers. 42 U.S.C. § 2000e-5. Such enforcement efforts include receiving, investigating, and resolving charges of discrimination. *Id*. Individual EEOC Commissioners, including the Chair, also have the authority to file charges of discrimination, often called "Commissioner's Charges." 42 U.S.C. § 2000e-5(b) (referring to charges "filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission"); 29 C.F.R. § 1601.11(a) ("Any member of the Commission may file a charge with the Commission."). A Commissioner's Charge is signed by a Commissioner under penalty of perjury and the existence of such charge is subject to Title VII confidentiality. 29 C.F.R. § 1601.11(a) ("Such charge shall be in writing and signed and shall be verified."). While not necessary to initiate a charge, in some instances a Commissioner may receive a

request for issuance of a Commissioner's Charge from a member of the public or an organization. Often these requests are public.

Contrary to the district courts' holdings, the EOs did not automatically necessitate issuance of such a charge, and the discretion whether to ultimately issue a Commissioner's Charge lies with the individual Commissioner. The law firm letter distribution referenced in at least one of the district court decisions was the EEOC engaging in informal information gathering (a tool contemplated by the EEOC's compliance manual) by sending letters requesting voluntary disclosures regarding potentially discriminatory conduct the firms publicly touted. *See* Stipulation of Dismissal, *Doe 1 v. EEOC*, Case No. 1:25-cv-01124, Doc. 43 (D.D.C. Feb. 9, 2026) (explaining that responding to letters to law firms "was voluntary" and "compliance was not mandatory"); *see also id.*, Declaration of Mary Katherine Littlejohn, Doc. 38-3 (July 31, 2025). The letters were not a Commissioner's Charge nor an investigation resulting from a charge as evidenced by their public disclosure, their lack of verification, and their invitation for voluntary cooperation. Rather, the letters asked recipients to share information about their employment practices with the EEOC to assist with its review as then-Acting Chair

45

Lucas contemplated whether to issue a Commissioner's Charge, whereupon an investigation would commence. While some firms reached settlements with the EEOC, most firms did not provide a response. Littlejohn Declaration, *Doe 1 v. EEOC*, Case No. 1:25-cv-01124, Doc. 38-3, at 3–4.

The DOJ provision merely directs investigations if there are Federal funding recipients discriminating on the basis of protected characteristics under civil rights statutes. This is what DOJ already does, even in the absence of any specific directive. In addition, the federal government has broad discretion to investigate discrimination; the fact that a referral came from the President does not change that.

Notably, none of the law firms were singled out in Section 4 of the EOs. Section 4 only references large law firms generally. Plaintiffs therefore lack standing to bring this type of pre-enforcement challenge, especially given that at least one of the firms, Susman, did not even receive a letter from the EEOC.

Plaintiffs' retaliation claim also fails on the merits, because the firms cannot show the requisite causal link. First Amendment retaliation claims require a plaintiff to show that (1) the plaintiff engaged

46

in conduct protected by the First Amendment; (2) the defendant took retaliatory action against the plaintiff, sufficient to deter an individual in plaintiff's position from speaking again; and (3) a causal connection between the speech and the retaliation. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). First Amendment retaliation claims are analyzed under a but-for causation standard. *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). Even before the EOs were issued, this Administration had begun taking steps consistent with the view that certain DEI practices could constitute a violation of Title VII. *See* EO 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 31, 2025). EO 14173, issued more than two months *before* the challenged Executive Orders, directed, among other things, federal agencies to take appropriate action to "advance in the private sector" merit-based opportunity, *id.* § 4(a), and to enforce civil rights laws and combat illegal private-sector DEI policies and practices, *id.* § 2; *see also id.* § 4(b) (requiring plan for compliance investigations going after illegal discrimination by large, private entities). The subjects at the focus of that EO extended beyond plaintiffs, negating any assertion that EEOC's investigation is retaliatory. In fact, the inquiry is in line with EEOC and

DOJ priorities pre-dating the EOs at issue here, as both agencies announced in the early days of the Administration that "rooting out unlawful DEI-motivated race and sex discrimination" was among their top concerns.  *See* EEOC, *President Appoints Andrea R. Lucas EEOC Acting Chair* (Jan. 21, 2025);[5] Memorandum from Attorney General, Re: Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025).[6]

## III. The District Courts Erred in Enjoining Section 3, Concerning Contractors, and Section 5, Concerning Guidance on Access to Buildings.

a. Plaintiffs' facial claims challenging Sections 3 and 5 of the EOs are unripe—and cannot demonstrate that those Sections are facially unconstitutional in any event.

As an initial matter, plaintiffs' facial challenges are not ripe.  A "dispute is not justiciable" if "it is not ripe for court review."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998).  Ripeness doctrine protects the Executive Branch "from judicial interference until a[] . . . decision has been formalized and its effects felt in a concrete way by the challenging

---

[5] *Available at* https://www.eeoc.gov/newsroom/president-appoints-andrea-r-lucas-eeoc-acting-chair.

[6] *Available at* https://www.justice.gov/ag/media/1388501/dl?inline.

parties." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Whereas constitutional ripeness is subsumed into the Article III standing inquiry that turns on whether the plaintiff has established "an injury-in-fact that is imminent or certainly impending," *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012), prudential ripeness balances "the fitness of the issues for judicial decision" against "the hardship to the parties of withholding court consideration." *Abbott Lab'ys*, 387 U.S. at 148-49. Where "[j]udicial intervention . . . would inappropriately interfere with ongoing action within the Executive Branch," a case is not ripe. *Common Cause v. Trump*, 506 F. Supp. 3d 39, 46 (D.D.C. 2020) (Katsas, J.). The Executive Branch should not be prevented from "crystallizing its policy before that policy is subjected to judicial review." *Id.* (quoting *Am. Petrol. Inst.*, 683 F.3d at 387).

Here, Sections 3 and 5 contemplate future implementation by agencies that has not yet occurred. Section 3(b) orders agencies to conduct a review of contracts and future disclosures. Only after completion of that review, and subject to the agency's future findings, are the agencies to take action. And such action must be aligned "with the

interests of the citizens of the United States," "as heads of agencies deem appropriate." None of that has occurred, so it is unclear what the agencies will determine is in the public interest or appropriate, let alone how that will concretely impact Plaintiffs. Similarly, Section 5(a) directs agencies to "provide guidance" regarding access to federal government buildings to preserve "national security" and "the interests of the United States." No agency has issued such guidance. Accordingly, there has not been adequate "development of facts needed by the court to decide the question it is asked to consider." *N.Y. State Ophthalmological Soc'y v. Bowen,* 854 F.2d 1379, 1386 (D.C. Cir. 1988). There is not only a "possibility that further consideration will actually occur before implementation is not theoretical, but real." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999). The plain text of Sections 3 and 5 *require* further action before implementation. In these circumstances, the district courts should not have "interfere[d] with ongoing action within the Executive Branch." *Common Cause*, 506 F. Supp. 3d at 45.

The district courts' failure to properly analyze plaintiffs' facial challenges underscores those ripeness problems (and constitutes

reversible error in its own right).  Generally, "a plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723, (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  In the First Amendment context, plaintiffs can prevail only if they establish that "a substantial number of [the EO's] applications are unconstitutional, judged in relation to the [EO's] plainly legitimate sweep." *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).  Lower courts cannot sidestep this framework by focusing on only unconstitutional applications. *Moody*, 603 U.S. at 723–24.  Instead, they must address "the full range of activities the laws cover" and only then "measure the constitutional against the unconstitutional applications." *Id.* at 724.  Indeed, because the President directed that each of the EOs is to be applied "consistent with applicable law," *e.g.*, Perkins EO, §§ 2, 3(b)(i), 6(b), they would, by their terms, have no effect to the extent all applications of them are unlawful.

When a case is not ripe because a particular directive has not been implemented, it may be difficult for courts to evaluate whether there are

circumstances in which the challenged action is valid (or to compare the action's legitimate sweep to any unconstitutional applications). Here, the district courts failed to perform that analysis entirely. For example, they did not acknowledge that federal agencies could determine that it is appropriate to terminate contracts or limit official access to government buildings if they found that the firms in question had engaged in racial discrimination or based on particularized national security concerns. Instead, they analyzed the most extreme possible implementations of the EOs in the abstract. In other words, the district courts not only short-circuited the Executive Branch's implementation process but also leveraged that lack of implementation to wipe out Sections 3 and 5 without considering their potential legitimate sweep.

b. Regardless, Sections 3 and 5 do not violate plaintiffs' constitutional rights (facially or otherwise). The district courts primarily held that those Sections (and in some cases, the entire EOs) constituted impermissible retaliation and viewpoint discrimination for speech and petitioning protected by the First Amendment. But that is incorrect. Importantly, much of the conduct about plaintiffs identified in Section 1 of the EOs is unprotected speech. For example, the EOs target racial

52

discrimination in employment by plaintiffs. *See, e.g.*, Perkins EO, §§ 1, 3(a), 4. And as the Supreme Court has recognized in the specific context of law firms, "invidious private discrimination . . . has never been accorded affirmative constitutional protections." *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (quoting *Norwood v. Harrison*, 413 U.S. 455, 470 (1973)). The use of the procurement power to combat racial discrimination or otherwise implement social policies has been a feature of executive orders since at least the 1940s. *Contractors Ass'n of E. Pa. v. Sec'y of Lab.*, 442 F.2d 159, 168–71 (3d Cir. 1971) (discussing "non-discrimination contract provisions" that were "required in all federal procurement contracts"). Any doubts about whether plaintiffs engaged in illegal racial discrimination are irrelevant: even if the President were mistaken about whether plaintiffs had engaged in constitutionally unprotected discrimination, that still would not constitute discrimination against constitutionally protected speech. *Cf. Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008) (Kavanaugh, J.) (in the Title VII context, the question is not whether non-discriminatory reason for action was based on facts that actually occurred, but whether the actor "*honestly and reasonably believed*" that such facts had occurred).

In addition, the EOs repeatedly emphasize past official conduct by government lawyers who were then hired by Plaintiffs. *See, e.g.*, Jenner EO, §§ 1, 5. Those individuals' actions "pursuant to their official duties" are likewise not protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). And because the First Amendment protects "conduct" only to the extent the conduct "is inherently expressive," *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 66 (2006), neither are plaintiffs' non-expressive decisions to "discriminate in the selection" of who they hire as attorneys in their for-profit businesses, *Hishon*, 467 U.S. at 78. The same logic applies to the EOs' accusations that plaintiffs engaged in litigation misconduct. *See, e.g.*, Perkins EO, § 1; *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("[B]aseless litigation is not immunized by the First Amendment right to petition.").

To the extent the district courts below held on a murky "separation of powers rationale," JA2854, that the President lacks authority to act on abuses of the judicial process (or to issue the EO more generally), JA3528, they simply ignored the discretion that the President retains in the areas

addressed by the EO (even if the judiciary *also* has power to respond to abuses of judicial process).

Given all that, it is immaterial whether *all* of the conduct identified in Section 1 of the EOs is constitutionally unprotected. Regardless, it is clear that the President would have issued the EOs based on the unprotected conduct repeatedly emphasized in the EOs. That motive is "sufficient to sustain" the EOs regardless of any other justification. *TikTok Inc. v. Garland*, 604 U.S. 56, 79 (2025) (in putative mixed-motive scenario, where "Congress would have passed the challenged provisions based on [a valid] justification alone," that "justification [is] sufficient to sustain the challenged provisions").

c. There are no other constitutional theories that could justify facially invalidating Sections 3 and 5.

Section 3 does not deprive plaintiffs of any "life, liberty, or property" within the meaning of the Due Process Clause. U.S. Const. amend. V. As an initial matter, "action that is directed against a third party and affects the citizen only indirectly or incidentally" does not implicate the Due Process Clause. *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 788 (1980); *see also id.* at 789 ("Over a century ago this Court recognized

the principle that the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of government action.").  So any action vis-à-vis third-party contracts cannot violate plaintiffs' due process rights.  Additionally, plaintiffs have no property interest in their commercial relationships with government contractors.  Indeed, the Supreme Court "has never held that government contracts for goods and services create property interests protected by due process."  2 Richard J. Pierce Jr., *Administrative Law Treatise* 764 (5th ed. 2010) ("With scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract.").  It follows that plaintiffs' more attenuated contracts-with-contractors, and vague assertions of nebulous impacts on client relationships more generally, cannot establish such an interest, either.  Finally, plaintiffs have not established any deprivation of liberty and property based on any "stigma" or "reputation" theory.  JA3520–21.  Nothing in the EO excludes anyone from working as an attorney, whether "formally or automatically" or based on a "showing of reputational harm"

that would prevent them from "find[ing] employment in [their] chosen field." *O'Donnel v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998).

Plaintiffs cannot claim that Section 3 burdens any associational rights either. Plaintiffs are not engaged in any expressive association when serving as government contractors or sub-contractors. To the extent plaintiffs believe they should be able to associate anonymously with government contractors (*i.e.*, without disclosure), such contractors are already subject to substantial disclosure requirements as a condition of doing business with the federal government—and Section 3 is narrowly tailored to the EOs' stated goal of facilitating agency review of contracts to ensure that, *inter alia*, federal funds are not flowing to entities that have engaged in racial discrimination. *See, e.g.*, Jenner EO, § 3(a). Section 3 also does not implicate the attorney-client privilege, which "does not protect from disclosure the identity of the client . . . and the general purpose of the work performed." *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 350 (D.D.C. 2018) (internal citation omitted).

Nor can plaintiffs claim that Section 3 (or the EO more broadly) violates the Equal Protection Clause. A "class of one" equal protection

57

claim would require each plaintiff to show that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). But, as one of the district courts below explained, plaintiffs have "failed to plausibly allege a group of 'similarly situated' firms"—or explain how any plaintiff "could have been 'singled out'" when EOs have issued as to "multiple other firms." JA2864.

Similarly, plaintiffs cannot establish that Sections 3 and 5 (or the EO more broadly) are void for vagueness. That doctrine applies when a law describes "conduct that is . . . proscribed" in a manner so vague that regulated parties lack guidance as to what is prohibited. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010). Here, Sections 3 and 5(a) do not proscribe any conduct (or even directly impose any consequences for past conduct, given that they leave implementation to agencies).

As for Section 5, the prohibition on building entry does not violate any First Amendment right to petition (or corresponding Due Process Clause liberty interest in such a right). "The Constitution does not grant to members of the public generally a right to be heard by public bodies[.]"

*Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283 (1984). Both plaintiffs and their clients remain free "to advocate ideas" by bringing and pursuing lawsuits. *Id.* at 286. If anything, the petition theory adopted by some of the district courts below reinforces the ripeness problems with plaintiffs' facial challenge. If plaintiffs were ever actually inhibited from petitioning the government, they could bring an as-applied challenge for that specific inhibition.

Nor does Section 5 run afoul of any Fifth or Sixth Amendment right-to-counsel guarantees. With respect to the Fifth Amendment, as one of the district courts below explained, any theory fails because plaintiffs cannot allege that their "clients are unable to obtain alternative qualified counsel." JA2867. With respect to the Sixth Amendment, the "right to choose one's own counsel is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Courts have thus upheld a wide range of incidental burdens based on neutral rules, such as bar admission requirements. *Id.* Section 5 merely contemplates future guidance that provides some limits for certain personnel in their access to federal buildings based on conduct that impairs national security and other interests of the United States. How that would

59

actually play out was never determined given that the relevant agencies had not fully implemented the EOs' directives—which only reinforces the ripeness problems with plaintiffs' claims.

## IV.  The District Courts Erred in Finding Section 1 Non-Severable and Enjoining Future Actions.

Finally, even if the district courts were correct in finding one or more merits violations, it was error to treat those orders as non-severable and to enjoin future actions based on the mere findings in Section 1.

Section 1 of the EOs is precatory language describing plaintiffs' activities as both law firms and employers.  It also contains the Executive Branch's policies to end illegal racial discrimination.  The respective orders identified specific conduct by each firm that raised national security or other public interest concerns.  All four EOs raised concerns with the firms' discriminatory employment practices.  The Perkins EO raised additional concerns about the firm's "unethical lack of candor before the court."  Perkins EO, § 1.  The Jenner and WilmerHale EOs cited the firms' decisions to hire attorneys whose conduct in government raised questions.   Jenner EO, § 1 (hiring of Andrew Weissmann); WilmerHale EO, § 1 (hiring of Robert Mueller, Aaron Zebley, and James Quarles).  The President is allowed to make statements about this.

60

Section 1 of the EOs is nothing other than a textbook example of government speech. The Supreme Court has made clear that "the Government's own speech . . . is exempt from First Amendment scrutiny." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). Like other governmental entities, the Executive Branch has the right to "speak for itself." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000). "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others." *Matal v. Tam*, 582 U.S. 218, 234 (2017). "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009). "It is the very business of government to favor and disfavor points of view." *Nat'l Endowment of the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring). But "[i]f every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in private sector, and the process of government as we know it radically transformed." *Keller v. State Bar of Cal.*, 496 U.S. 1, 12–13 (1990).

Courts identify government speech by looking to history, the objective expectations of observers, and who exercises control over the message. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210 (2015). Presidents have long used the preambles of Executive Orders to express their own views. Everyone recognizes this is the President's own speech. That is because the President alone controls the content of his Executive Orders, which he publicly signs. Section 1 of the EO is a paradigmatic example of government speech.

When individuals disagree with government speech, there is a prescribed remedy. "The Constitution . . . relies first and foremost on the ballot box . . . to check the government when it speaks." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022). But courts are on dangerous ground when enjoining the speech of co-equal branches of government. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"). The government is "ultimately accountable to the electorate and the political process for its advocacy," and "[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position." *Pleasant Grove*, 555 U.S. at 468–69

(internal citation omitted). This Court should reject plaintiff's attempt to short-circuit the democratic process by lawsuit.

Significantly, even the district court in *Jenner* recognized this. That court declined to "enjoin future actions taken pursuant to Section 1," because "Section 1 does not direct any action." JA2205–06. But "shorn of its enforcement mechanisms, Section 1 is nothing more than the Executive Branch 'saying what it wishes.'" *Id.* (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024)). "Jenner has no more right to silence the Executive Branch than the Executive Branch has to silence Jenner." *Id.* That is because Section 1 is "government speech." *Id.* Despite Jenner's repeated request to enjoin Section 1 in the abstract, the district court correctly recognized that "[n]either standing doctrine nor equity generally permits such judicial prophylaxis." JA2207. Thus, "[w]hether best viewed as a shortcoming of standing, ripeness, or" the lack of any basis in equity, "the guesswork entailed in enjoining all future uses of the sentiments expressed in Section 1 would exceed the Court's proper role." *Id.*

At the very least, Section 1 is severable. There is "a strong presumption of severability." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*,

591 U.S. 610, 625 (2020). "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010). Courts ask whether the "provisions are capable of functioning independently." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 235 (2020). Here, Section 1 is rife with government speech and opinions that can stand alone. A court may not take something the President has said and forever enjoin actions based in the abstract.

To be sure, if in the future defendants take concrete actions based on Section 1, courts could review those actions at the time and enjoin them if appropriate. But courts may not enjoin all future actions predicated on Section 1, without evening knowing what those actions are. To take one illustration, even if Sections 2 through 5 are unconstitutional, surely Cabinet Secretaries can remain free to decide not to appoint attorneys from plaintiff firms to high-ranking policy making positions. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 71 n.5 (1990) (Stevens, J., concurring) (recognizing that the government can consider viewpoints when making such appointments). Yet the three

64

district courts' orders, read literally, would forbid even this. This too was error.

Additionally, all other individual sections should be viewed as severable from one another. As noted in the *Jenner* decision, the orders direct a number of discrete actions that are not dependent on one another for their operation. JA2171 n.9. Therefore, if this Court decides that some of the sections are lawful while others are not, it should allow those lawful ones to take effect.

## CONCLUSION

For the foregoing reasons, the judgments of the district courts should be reversed.

Dated:     March 6, 2026        Respectfully submitted,
           Washington, D.C.

                                STANLEY E. WOODWARD, JR.
                                Associate Attorney General

                                /s/ *Abhishek Kambli*
                                ABHISHEK KAMBLI
                                Deputy Associate Attorney General
                                950 Pennsylvania Avenue, NW
                                Washington, DC 20530
                                Telephone: (202) 514-9500

                                *Counsel for Defendants-Appellants*

65

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit prescribed by this Court's February 6, 2026, Order (Doc. #2157928) because it contains 13,902 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font.

*/s/ Abhishek S. Kambli*
ABHISHEK S. KAMBLI

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Abhishek S. Kambli*

ABHISHEK S. KAMBLI

**ADDENDUM**

# TABLE OF CONTENTS

U.S. Const. art. I, Sec. 8, Cl. 1................................................... A1

U.S. Const. amend I. .............................................................. A1

U.S. Const. amend. V .............................................................. A1

U.S. Const. amend. VI............................................................. A1

Executive Order 14230, Addressing Risks From Perkins Coie LLP, 90 Fed. Reg. 11781 (March 6, 2025) ........................................... A1

Executive Order 14246, Addressing Risks from Jenner & Block, 90 Fed. Reg. 13997 (March 25, 2025) ............................................ A5

Executive Order 14246, Addressing Risks from Jenner & Block, 90 Fed. Reg. 13997 (March 25, 2025). ........................................... A8

Executive Order 14263, Addressing Risks from Susman Godfrey, 90 Fed. Reg. 15615 (April 9, 2025).................................................. A11

**U.S. Const. art. I, sec. 8, cl. 1:**

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States

**U.S. Const. amend I:**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**U.S. Const. amend. V:**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**U.S. Const. amend. VI:**

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

**Executive Order 14230, Addressing Risks From Perkins Coie LLP, 90 Fed. Reg. 11781 (March 6, 2025):**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose. The dishonest and dangerous activity of the law firm Perkins Coie LLP ("Perkins Coie") has affected this country for decades.

Notably, in 2016 while representing failed Presidential candidate Hillary Clinton, Perkins Coie hired Fusion GPS, which then manufactured a false "dossier" designed to steal an election. This egregious activity is part of a pattern. Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification. In one such case, a court was forced to sanction Perkins Coie attorneys for an unethical lack of candor before the court.

In addition to undermining democratic elections, the integrity of our courts, and honest law enforcement, Perkins Coie racially discriminates against its own attorneys and staff, and against applicants. Perkins Coie publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights laws. It proudly excluded applicants on the basis of race for its fellowships, and it maintained these discriminatory practices until applicants harmed by them finally sued to enforce change.

My Administration is committed to ending discrimination under "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant race-based and sex-based discrimination, including quotas, but purposefully hide the nature of such discrimination through deceiving language, have engaged in a serious violation of the public trust. Their disrespect for the bedrock principle of equality represents good cause to conclude that they neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

Sec. 2. Security Clearance Review. (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of

A2

Perkins Coie. The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3. Contracting. (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract.

(b) The heads of all agencies shall review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Perkins Coie has been hired to perform any service;

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Perkins Coie or with entities that do business with Perkins Coie effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4. Racial Discrimination. (a) The Chair of the Equal Employment Opportunity Commission shall review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis.

A3

(b) The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered.

Sec. 5. Personnel. (a) The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Executive Order 14246, Addressing Risks from Jenner & Block, 90 Fed. Reg. 13997 (March 25, 2025):**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Background. My Administration is committed to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests. Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles. Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients. Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Jenner & Block LLP (Jenner) is yet another law firm that has abandoned the profession's highest ideals, condoned partisan "lawfare," and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States. For example, Jenner engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders. Moreover, Jenner discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

In addition, Jenner was "thrilled" to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation. Andrew Weissmann's career has been rooted in weaponized government and abuse of power, including devastating tens of thousands of American families who worked for the now defunct Arthur Andersen LLP, only to have his unlawfully aggressive prosecution overturned by the Supreme Court. The numerous reports of Weissmann's dishonesty, including pursuit of

A5

nonexistent crimes, bribery to foreign nationals, and overt demand that the Federal Government pursue a political agenda against me, is a concerning indictment of Jenner's values and priorities.

Sec. 2. Security Clearance Review. (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Jenner. The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3. Contracting. (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract.

(b) The heads of agencies shall review all contracts with Jenner or with entities that disclose doing business with Jenner under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Jenner has been hired to perform any service; and

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Jenner or with entities that do business with Jenner effective as of the

A6

date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4. Racial Discrimination. Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5. Personnel. (a) The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Jenner when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Jenner employees, including but not limited to Andrew Weissmann, to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Jenner, including but not limited to Andrew Weissmann, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Executive Order 14250, Addressing Risks From WilmerHale, 90 Fed. Reg. 14549 (March 27, 2025):**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Background. My Administration is committed to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests. Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles. Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients. Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) is yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States. For example, WilmerHale engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote. Moreover, WilmerHale itself discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

WilmerHale is also bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice. For example, WilmerHale rewarded Robert Mueller and his colleagues— Aaron Zebley, Mueller's "top aide" and "closest associate," and James Quarles—by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history. Mueller's investigation epitomizes the

A8

weaponization of government, yet WilmerHale claimed he "embodies the highest value of our firm and profession." Mueller's "investigation" upended the lives of public servants in my Administration who were summoned before "prosecutors" with the effect of interfering in their ability to fulfill the mandates of my first term agenda. This weaponization of the justice system must not be rewarded, let alone condoned.

Sec. 2. Security Clearance Review. (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale. The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3. Contracting. (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract.

(b) The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which WilmerHale has been hired to perform any service; and

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive

Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4. Racial Discrimination. Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5. Personnel. (a) The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Executive Order 14263, Addressing Risks from Susman Godfrey, 90 Fed. Reg. 15615 (April 9, 2025):**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Background. Lawyers and law firms that engage in activities detrimental to critical American interests should not have access to our Nation's secrets, nor should their conduct be subsidized by Federal taxpayer funds or contracts. My Administration must also take appropriate and necessary measures to guard against the actual, potential, or perceived conflicts of interest that arise when the Government funds, engages with, or otherwise devotes resources to law firms and their clients that engage in conduct undermining critical American interests and priorities.

I have determined that action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman Godfrey LLP (Susman). Susman spearheads efforts to weaponize the American legal system and degrade the quality of American elections. Susman also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology, and it supports efforts to discriminate on the basis of race.

Susman itself engages in unlawful discrimination, including discrimination on the basis of race. For example, Susman administers a program where it offers financial awards and employment opportunities only to "students of color." My Administration is committed to ending such unlawful discrimination perpetrated in the name of "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant discrimination and other activities inconsistent with the interests of the United States should not have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

A11

Sec. 2. Security Clearance Review. (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman. The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3. Contracting. (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract.

(b) The heads of agencies shall review all contracts with Susman or with entities that disclose doing business with Susman under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Susman has been hired to perform any service; and

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Susman or with entities that do business with Susman effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4. Racial Discrimination. Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5. Personnel. (a) The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Susman employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.