**ORAL ARGUMENT SCHEDULED MAY 14, 2026**
Nos. 25-5241, 25-5265, 25-5277, 25-5310

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

PERKINS COIE LLP,

*Plaintiff-Appellee,*

v.

U.S. DEPARTMENT OF JUSTICE ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

**BRIEF OF THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND SIX CIVIL RIGHTS ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Edward G. Caspar
*Counsel of Record*
Adria Bonillas
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
ecaspar@lawyerscommittee.org

*Counsel for* Amici Curiae *Lawyers' Committee
for Civil Rights Under Law et al.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26.1 and D.C. Circuit Rules 12(f), 26.1, and 29(b), *amici curiae* the Lawyers' Committee for Civil Rights Under Law, Public Counsel, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Public Interest Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Mississippi Center for Justice, and Lawyers' Committee for Civil Rights of the San Francisco Bay Area, state that they are nongovernmental nonprofit corporations. None has a parent company, and no publicly held corporation owns 10% or more of the stock of any of the *amici curiae* listed above.

i

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for the Appellants. References to rulings at issue and related cases also appear in the Brief for the Appellants.

## STATEMENT REGARDING CONSENT TO FILE AND JUSTIFICATION FOR SEPARATE BRIEFING

All parties consented to the timely and rule-compliant filing of this brief. Pursuant to D.C. Circuit Rule 29(d), counsel for the *amici curiae* listed above certify that a separate brief is necessary to express the views of the civil rights community and to opine on an existential threat the Executive Orders represent to the critical tradition of American law firms providing pro bono representation to protect civil rights. To avoid duplication, these seven civil rights organizations have joined together to file this single brief.

Dated: April 3, 2026

Respectfully submitted,

*/s/  Edward Caspar*
Edward G. Caspar
 *Counsel of Record*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600
ecaspar@lawyerscommittee.org

*Counsel for* Amici Curiae *Lawyers' Committee for Civil Rights Under Law et al.*

iii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

STATEMENT REGARDING CONSENT TO FILE AND JUSTIFICATION FOR SEPARATE BRIEFING ........................................................................................ iii

TABLE OF AUTHORITIES ...........................................................................v

GLOSSARY............................................................................................... viii

INTEREST OF AMICI ....................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................8

ARGUMENT .................................................................................................9

I.    Pro Bono Representation is Central to the Protection of Civil Rights and the Rule of Law. ...............................................................................11

    A.    An Independent Judiciary Demands a Robust Adversarial System....12

    B.    Pro Bono Representation Has Contributed Significantly to the Preservation of Our Constitution's Structure and Its Guarantees.......14

        1.    The American legal system recognizes a professional responsibility to undertake pro bono representation.................14

        2.    The Lawyers' Committee and its local affiliates robustly leverage pro bono representation to protect civil rights. ..........15

II.   The District Courts Correctly Enjoined the Executive Orders, Which Have Caused Grave Harm to the Public Interest in Pro Bono Representation and the Pro Bono Bar. ...................................................................................18

    A.    The Executive Orders Cause Grave Harm to Communities the Lawyers' Committee and Its Affiliates Serve....................................19

    B.    The Executive Orders Cause Grave Harm to the Pro Bono Bar.........22

CONCLUSION ............................................................................................26

# TABLE OF AUTHORITIES

## Cases

*2801 15th St. NW Unidos v. 2801 Fifteenth St., NW LLC*, 2022-CA-001459-R(RP) (D.C. Super. Ct. 2022) ............................................................. 3, 20

*Bond v. United States*, 564 U.S. 211 (2011) ............................................................12

*Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142 (1907) ...................................13

*Coalition on Homelessness v. San Francisco*, No. CPF-18-516546, 2023 WL 12032691 (Cal. Super. Ct. S.F., Cnty. 2021)...............................................6, 19

*Jones v. Village of Richton Park*, No.1:23-cv-15802 (N.D. Ill) ...............................5

*Legal Servs. Corp v. Velazquez*, 531 U.S. 533 (2001)...............................................12

*McWaters v. FEMA*, 408 F. Supp. 2d 221 (E.D. La. 2005)......................... 1, 18, 23

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).......................... 1, 16, 17

*Ocana v. Renew Fin. Holdings, Inc.*, No. BC701809 (Cal. Super. Ct., L.A. Cnty. 2018) ....................................................................................................... 2, 19

*Penson v. Ohio*, 488 U.S. 75 (1988) .......................................................................13

*Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001)......................................................25

*Strickland v. Washington*, 466 U.S. 668 (1984) .....................................................13

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ...................................29

*Wash. Park Lead Comm., Inc. v. EPA*, No. 2:98CV421, 1998 WL 1053712 (E.D. Va. Dec. 1, 1998)................................................................................... 1, 18

*William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 294 A.3d 537 (Pa. Commw. Ct. 2023) ................................................................................................. 4, 16, 19

*Zirbel v. Wilmington Sch. Dist.*, No 1:19-cv-04660 (N.D. Ill) ...............................19

**Other Authorities**

Alan Berube & Bruce Katz, *Katrina's Window: Confronting Concentrated Poverty Across America*, Brookings Inst., Oct. 2005, available at https://tinyurl.com/4d73mvbh .....................................................................23

Am. Bar Ass'n, *Canons of Pro. Ethics* 585 (1908) ..................................................15

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983)......................... 8, 11

Arloc Sherman & Isaac Shapiro, *Essential Facts About the Victims of Hurricane Katrina*, Ctr. on Budget & Pol'y Priorities, (Sept. 19, 2005), http://www.cbpp.org/9-19-05pov.htm........................................................22

Deborah L. Rhode, Access to Justice 146 (2004).....................................................16

Exec. Order No. 14244, 90 Fed. Reg. 13685 (Mar. 21, 2025) ................................28

Lon L. Fuller & John D. Randall*, Professional Responsibility: Report of the Joint Conference of the ABA and AALS*, 44 A.B.A. J. 1159 (1958) ............... 13, 28

Louis Galambos, *The Emerging Organizational Synthesis in Modern American History*, 44 Bus. Hist. Rev. 279 (1970) .........................................................15

Mike Spector et al., *How Trump's Crackdown on Law Firms Is Undermining Legal Defenses for the Vulnerable*, Reuters (Aug. 3, 2025), https://www.reuters.com/investigations/trumps-war-big-law-leads-firms-retreat-pro-bono-work-underdogs-2025-07-31/ ............................................26

Model Rules of Pro. Conduct R. 6.1 .......................................................................16

Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025) ...............................................28

Shayna Jacobs, Clara Ence Morse and Mark Berman, *Nation's Biggest Law Firms Back Off from Challenging Trump Policies*, Wash. Post (Oct. 26, 2025), https://www.washingtonpost.com/national-security/2025/10/26/smaller-law-firms-struggle-trump-administration-initiatives/ ..........................................27

vi

*Suspension of Security Clearances and Evaluation of Government Contracts*, The White House (Feb. 25, 2025), available at https://tinyurl.com/4z7fvhmm.....8

The Federalist No. 78 (C. Rossiter ed. 1961) ...........................................................12

U.S. Sent'g Comm'n, *An Analysis of the Implementation of the 2014 Clemency Initiative* (Sept. 2017) ......................................................................... 18, 24

# GLOSSARY

| ABA | American Bar Association |
|---|---|
| EO | Executive Order |
| Jenner & Block | Jenner & Block LLP |
| Perkins, Perkins Coie | Perkins Coie LLP |
| Susman Godfrey | Susman Godfrey LLP |
| WilmerHale | Wilmer Cutler Pickering Hale and Dorr LLP |

## INTEREST OF AMICI[1]

*Amicus* Lawyers' Committee for Civil Rights Under Law is a nonpartisan, nonprofit organization, formed in 1963 at the request of President John F. Kennedy to enlist the private bar's leadership and resources in combating racial discrimination and the resulting inequality of opportunity—work that remains vital today. As part of this work, the Lawyers' Committee uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have voice, opportunity, and power to make the promises of our democracy real. The Lawyers' Committee is a catalyst within the civil rights community, having been at the forefront of many significant civil rights cases. *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); *Wash. Park Lead Comm., Inc. v. EPA*, No. 2:98CV421, 1998 WL 1053712 (E.D. Va. Dec. 1, 1998); *McWaters v. FEMA*, 408 F. Supp. 2d 221 (E.D. La. 2005). Each year, lawyers from across the country partner with the Lawyers' Committee to provide pro bono legal services for the protection of civil rights. The private bar thus plays a critical role in the Lawyers' Committee's mission and its provision of effective legal advocacy.

*Amicus* Public Counsel is a nonprofit public interest law firm dedicated to advancing civil rights and racial and economic justice, as well as to amplifying the

---

[1] No counsel for any party authored this brief in whole or part, and no person apart from *amici* or their counsel contributed money intended to fund the brief's preparation and submission.

power of their clients through comprehensive legal advocacy. It is the Southern California affiliate of the Lawyers' Committee for Civil Rights Under Law. Founded on and strengthened by a pro bono legal service model, Public Counsel's staff and volunteers seek justice through direct legal services, promote healthy and resilient communities through education and outreach, and support community-led efforts to transform unjust systems through litigation and policy advocacy in and beyond Los Angeles. Public Counsel relies heavily on the private bar as partners in its litigation, and thus has a strong interest in ensuring that the private bar can litigate against the federal government without fear of retribution. *See*, *e.g.*, *Ocana v. Renew Fin. Holdings, Inc.*, No. BC701809 (Cal. Super. Ct., L.A. Cnty. 2018) (partnering with private law firm to successfully challenge predatory home improvement loans).

*Amicus* Washington Lawyers' Committee for Civil Rights and Urban Affairs is a nonprofit civil rights organization established to combat racial discrimination and poverty by enforcing civil rights laws through litigation and public policy advocacy in the District of Columbia, Virginia, and Maryland. Since its founding in 1968, the Washington Lawyers' Committee has worked in partnership with private law firms to pursue its objectives and relies on the pro bono resources and commitment of the private bar. *See*, *e.g.*, *2801 15th St. NW Unidos v. 2801 Fifteenth St., NW LLC*, 2022-CA-001459-R(RP) (D.C. Super. Ct. 2022) (partnering with private law firm to represent class of tenants affected by unsafe and unlawful housing

2

conditions). Government retaliation against the private bar poses an immediate threat to the Committee's co-counsel model and thereby endangers its important public interest mission.

*Amicus* Public Interest Law Center was founded in 1969 as the Philadelphia affiliate of the Lawyers' Committee for Civil Rights Under Law. The Law Center uses high-impact legal strategies to advance the civil, social, and economic rights of communities in the Philadelphia region and throughout Pennsylvania facing discrimination, inequality, and poverty. It uses litigation, community education, advocacy, and organizing to secure access to fundamental resources and services in the areas of public education, housing, health care, employment, environmental justice, and voting. For the past 57 years, the Law Center has worked alongside pro bono co-counsel in the private bar to defend constitutional rights, protect democracy, and ensure equal justice under the law. The Law Center regularly partners with pro bono co-counsel to litigate cases of critical importance. *See*, *e.g.*, *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 294 A.3d 537 (Pa. Commw. Ct. 2023) (partnering with pro bono counsel to successfully challenge Pennsylvania's school funding system as unconstitutional and in need of reform). As a small nonprofit that does not charge its clients, co-counseling with pro bono lawyers substantially increases the Law Center's capacity. If law firms were to be deterred from providing pro bono

assistance, the Law Center's continued ability to bring and win landmark cases would be significantly undermined.

*Amicus* Chicago Lawyers' Committee for Civil Rights is a nonprofit legal organization founded in 1969 that works to secure racial equity and economic opportunity for all. Chicago Lawyers' Committee for Civil Rights provides legal representation through partnerships with the private bar and collaborates with grassroots organizations and other advocacy groups throughout Illinois and Indiana. Through litigation, legislative and policy advocacy, and coalition work, Chicago Lawyers' Committee works to advance civil rights by implementing community-driven solutions that promote transparency, accountability, and equity. The contributions of law firms through pro bono representation of clients are critical to the work of Chicago Lawyers' Committee. Chicago Lawyers' Committee partners with pro bono attorneys from over 30 law firms across the Midwest to ensure clients and communities in need have access to legal counsel to protect basic civil rights in areas like voting, education, and fair housing, and to bring impact litigation to challenge discriminatory systems. *See, e.g., Jones v. Village of Richton Park,* No. 1:23-cv-15802 (N.D. Ill.) (partnering with pro bono law firm counsel to litigate constitutional challenge to municipality's ordinance punishing renters for contacting emergency services). Pro bono attorneys also work with our organization to provide transactional legal support to hundreds of nonprofits that provide critical social

4

services to communities in need and to small businesses building healthy local economies. In 2025, law firms committed over 5,600 hours to support this work. The uncertain landscape created by the Executive Orders attacking law firms has stretched the organization's capacity to meet these critical client needs and jeopardizes work to build stronger communities.

*Amicus* Mississippi Center for Justice is a nonprofit, public-interest law firm committed to advancing racial, social, and economic justice. Mississippi Center for Justice was organized to address the urgent need to re-establish in-state advocacy for low-income people and communities of color. Mississippi Center for Justice is supported and staffed by attorneys and other professionals working to develop and pursue strategies to combat discrimination and poverty and collaborates with the private bar to advance its mission.

*Amicus* Lawyers' Committee for Civil Rights of the San Francisco Bay Area, founded in 1968, works to dismantle systems of oppression and racism and build an equitable and just society. In 2025, Lawyers' Committee for Civil Rights of the San Francisco Bay Area trained and partnered with more than 1,000 volunteer attorneys, paralegals, law clerks, and interpreters, who donated more than 20,000 hours to represent, advise, and counsel more than 500 clients through direct service, impact litigation, and policy advocacy in pursuit of racial, economic, and immigrant justice. Partnership with the private bar is integral to our ability to challenge policies,

institutions, and systems that are violent, unjust, and inequitable to historically marginalized communities. *See*, *e.g.*, *Coalition on Homelessness v. San Francisco*, No. CPF-18-516546, 2023 WL 12032691 (Cal. Super. Ct. S.F. Cnty. 2023) (partnering with private law firm in action prompting city to end practice of poverty-based vehicle towing). Law firms' hesitation to engage in legal matters disfavored by the administration could threaten critical opportunities to vindicate and protect the civil rights of underserved communities.

For decades, the local Lawyers' Committees have successfully litigated cases to secure civil rights and address many of the same issues as the national Lawyers' Committee. Each local Committee has also taken on other issues that reflect the needs of their respective communities. The national Lawyers' Committee works effectively with the local Committees and regularly partners with them on specific litigation and legal advocacy to strengthen what is already the largest network of private lawyers in America directed to advocate for civil rights.

The Executive Orders represent an existential threat to the critical tradition of American law firms providing pro bono representation to protect civil rights. *Amici* are uniquely situated to opine on a substantial inequity the Executive Orders have caused, and will continue to cause, as well as its deleterious effect on the public interest. As civil rights organizations that leverage the resources of private law firms to hold government at all levels to account, *amici* are also well positioned to discuss

the harm to those communities who rely on pro bono firm assistance if those firms

no longer represent them for fear of retribution by the chief executive.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The objective of the Executive Orders is to cow into submission, through a campaign of official intimidation, not only its express targets, appellees, but also any other law firm tempted to advocate positions displeasing to the Trump Administration. *See, e.g.*, Perkins EO, JA487–89; Paul Weiss EO, JA1979–81; Jenner & Block EO, JA2012–14; WilmerHale EO, JA2332–35; Susman Godfrey EO, JA3146–48; *see also Suspension of Security Clearances and Evaluation of Government Contracts*, The White House (Feb. 25, 2025), available at https://tinyurl.com/4z7fvhmm (suspending security clearances of lawyers at Covington & Burling LLP). The campaign is brazenly unconstitutional, for the many reasons held by four separate judges of the district court.

Worse still, as this brief conveys, the Executive Orders threaten the continued vitality of our system of separation of powers and its promise to "assure the absence of despotism." Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 881 (1983). The judiciary's ability to serve as a check on government abuse largely relies on the zealous advocacy of legal counsel in our adversarial system of justice. By punishing law firms for their advocacy in support of clients or causes this Administration disfavors, the government aims to suppress challenges to its overreach and chill legal representation for those who need it most.

*Amici* support affirmance of the district court orders granting summary judgment for Perkins Coie, WilmerHale, Jenner & Block, and Susman Godfrey and upholding the declaratory and injunctive relief issued. The Executive Orders form an existential threat to the tradition—central and critically important to our system of justice—of law firms representing clients, often on a pro bono basis, against government action. Unless this Court upholds the findings of the district court that these Executive Orders are unconstitutional, they will have an immediate and lasting chilling effect on law firm engagement in pro bono representation. Clients and communities like those whom the national and local Lawyers' Committees represent alongside the nation's leading law firms would bear the brunt of this harm.

## ARGUMENT

The district courts correctly held the Executive Orders unconstitutional. Collectively, these Executive Orders seek to silence critics, target opponents, and chill law firms from representing clients or causes disfavored by the chief executive. In doing so, the Executive Orders threaten—and indeed have had—a dramatic adverse impact on access to pro bono counsel by vulnerable communities facing governmental overreach. The Lawyers' Committee and its local affiliates file this amicus brief in support of appellees to emphasize the public's interest in zealous pro bono representation, especially in cases involving civil rights enforcement, and the threat the Executive Orders continue to pose to those interests.

9

The Lawyers' Committee was born of the need for legal counsel in the face of oppression by the government and private actors. It is no surprise that in 1963, demands for racial justice were increasingly met with hostility and outright lawlessness, intimidation, and violence. That is precisely why that year President Kennedy called nearly 250 lawyers to the White House and urged them to defend the rule of law and the rights of civil rights activists. Within one week of that historic meeting, the Lawyers' Committee was formed. The specific goal: to obtain equal opportunity for Black people, specifically by marshaling the resources of the private bar to engage in the fight for racial justice. Most notably, key leaders in the private bar came together across lines of difference by race, geography, and party affiliation to advance this mission. For over sixty years, the Lawyers' Committee has partnered with the private bar in its pro bono representation of our shared clients, leveraging the resources of law firms to advocate for communities living on the margins, who have long faced barriers to equality and endured the ongoing effects of systemic racism and discrimination. In partnership with law firms providing pro bono representation, the Lawyers' Committee has worked to protect voting rights and educational opportunities, promote economic justice and fair housing, address inequity in the criminal justice system, and combat organized racial hatred. The Lawyers' Committee's affiliates, which tailor civil rights advocacy to the needs of their local communities, work to address many of the same issues, and more. Local

10

Lawyers' Committees engage in a range of advocacy, also with pro bono assistance, such as representing children in poverty, representing immigrant applicants for asylum and refugee rights, and protecting the rights of people with disabilities, among other subject areas. The mere existence of these Executive Orders has jeopardized all of this work. If the government has its way and successfully appeals the district courts' decisions, the impact of the Executive Orders on vulnerable communities would be catastrophic.

## I.    Pro Bono Representation is Central to the Protection of Civil Rights and the Rule of Law.

No principle is of greater importance to our form of government than the separation of powers: "[T]hat feature, above all others, was to assure the absence of despotism." Scalia, *The Doctrine of Standing*, 17 Suffolk U. L. Rev. at 881. It is this principle that "protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

The separation of powers in our system of government requires three independent, coordinate branches. The judiciary is uniquely situated among those three, having itself neither sword nor purse. *See* The Federalist No. 78, at 465 (C. Rossiter ed. 1961). The judiciary's power to check abuses by the legislative and executive branches comes from its judgment. *See id.* And that judgment, in turn, is shaped by zealous advocacy—often for unpopular causes—in our unique, adversarial system of justice.

11

**A.    An Independent Judiciary Demands a Robust Adversarial System.**

"An informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 534 (2001) (holding that statute restricting recipients of Legal Services Corporation funding from challenging "existing welfare law" violated the First Amendment). The latter aids the former by "present[ing] all the reasonable and well-grounded arguments necessary for proper resolution of the case." *Id.* at 545. For this reason, "forceful and vigorous advocacy" is of "paramount importance in our adversary system of justice." *Penson v. Ohio*, 488 U.S. 75, 76 (1988); *see also* Lon L. Fuller & John D. Randall, *Professional Responsibility: Report of the Joint Conference of the ABA and AALS*, 44 A.B.A. J. 1159, 1160 (1958) ("[T]he integrity of the adjudicative process itself depends upon the participation of the advocate."). It has been that way from the start of the republic, as the Sixth Amendment right to counsel reflects the understanding that lawyers play "a role that is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington*, 466 U.S. 668, 685 (1984); *see also Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142, 148 (1907) (The ability to "sue and defend" is "conservative of all other rights, and [it] lies at the foundation of orderly government.").

All four district court judges recognized that the Executive Orders ran roughshod over the concept of an independent judiciary. JA1729 ("Plaintiff,

12

meanwhile, has demonstrated the strong interests . . . [of] the American legal system and the public more broadly, in issuance of an injunction to protect the independence of counsel to represent their clients vigorously and zealously, without fear of retribution from the government simply for doing the job of a lawyer."); JA3532 ("The Order threatens the independence of the bar—a necessity for the rule of law."); JA2875 ("Enjoining the Order serves the public interest by, for example, eliminating an obstacle to free speech and preserving the independent and adversarial nature of our judicial system."). The Executive Orders seek to punish appellees for having undertaken the very task required of them by the judiciary: zealous representation in adversarial proceedings. But representing clients in causes disfavored by the chief executive has not generally exposed American lawyers to retribution without due process. At least until now. The Executive Orders exact costly, undisguised vengeance on law firms by revoking security clearances, limiting access to government buildings, harassing lawyers for their "avowed progressive employment policies," and terminating government contracts held by appellees and their clients, "in an overt attempt to suppress and punish certain viewpoints . . . contrary to the Constitution." JA1631. Allowing this undeserved punishment to go unchecked would threaten the independence of the judiciary by chilling the advocacy on which it depends to function, including as a shield against abuses by the other coordinate

13

branches. And because these Executive Orders are just some in a series that impose the same punishment on different actors for similar conduct, that threat grows.

### B.    Pro Bono Representation Has Contributed Significantly to the Preservation of Our Constitution's Structure and Its Guarantees.

The provision of legal services *pro bono publico* ("for the public good") is an essential feature of the American legal system.

### 1.    *The American legal system recognizes a professional responsibility to undertake pro bono representation.*

The concerted effort by the profession to provide pro bono services came with the boom in industry and population in the latter part of the nineteenth century. *See generally* Louis Galambos, *The Emerging Organizational Synthesis in Modern American History*, 44 Bus. Hist. Rev. 279 (1970). At the turn of the twentieth century, the ABA's recommended oath for lawyers included the promise that the lawyer would "never reject, from any consideration personal to [himself], the cause of the defenseless or oppressed." Am. Bar Ass'n, *Canons of Pro. Ethics* 585 (1908). Over time this general oath became more specific. *See* ABA Model Code of Pro. Resp. EC 2-25 ("A lawyer has an obligation to render public interest and pro bono legal service."); Model Rules of Pro. Conduct R. 6.1 ("Every lawyer has a professional responsibility to provide legal services to those unable to pay. A lawyer should aspire to render at least (50) hours of pro bono publico legal services per year."). This development reflects the profession's understanding that "access to

14

justice is a fundamental interest" and "that inadequate legal assistance jeopardizes individual rights, compounds other social inequalities, and undermines a commitment to justice." Deborah L. Rhode, Access to Justice 146 (2004).

Pro bono representations are as varied as the law itself, and they have contributed immensely to the advancement and security of civil rights. *See, e.g.*, *NAACP v. Claiborne Hardware Co*., 458 U.S. at 914 (pro bono representation culminating in holding that the First Amendment protects "a nonviolent, politically motivated boycott designed to force governmental and economic change"); *William Penn Sch. Dist.*, 294 A.3d at 962–65 (pro bono representation culminating in holding Pennsylvania's school funding system was unconstitutional and that every child in Pennsylvania has a fundamental right to receive a comprehensive, effective, and contemporary public education).

> 2. *The Lawyers' Committee and its local affiliates robustly leverage pro bono representation to protect civil rights.*

Each year, lawyers from across the country partner with the Lawyers' Committee and their affiliates to provide pro bono legal services to clients in cutting-edge civil rights cases. The Lawyers' Committee boasts nearly 200 board members, made up of lawyers from the largest law firms to small and mid-sized firms, as well as professors at law schools, and in-house corporate counsel. While the impact of *amici's* pro bono partners is immeasurable, the following examples demonstrate just how significant our work in collaboration with pro bono counsel has been.

15

Consider *NAACP v. Claiborne Hardware*. There, the Lawyers' Committee and pro bono counsel represented the National Association for the Advancement of Colored People ("NAACP") when white business owners in Mississippi sued the NAACP in response to an economic boycott campaign promoting racial equality and integration. *Id.* at 888–89. The Supreme Court ruled in favor of the NAACP, holding that boycotting businesses was a protected activity under the First Amendment. *Id.* at 914–15. Or *McWaters v. FEMA*, where the Lawyers' Committee brought the very first challenge against FEMA in response to Hurricane Katrina, successfully stopping the evictions of nearly 100,000 Katrina survivors in New Orleans and forcing FEMA to improve and continue providing housing assistance to victims. 408 F. Supp. 2d 221 (E.D. La. 2005). In *Wash. Park Lead Comm., Inc. v. EPA*, the Lawyers' Committee and pro bono counsel successfully sued the EPA on behalf of Black residents living in low-income public housing who suffered from lead poisoning due to contamination from an operating foundry adjacent to their homes. No. 2:98CV421, 1998 WL 1053712 (E.D. Va. Dec. 1, 1998). As a result of the lawsuit, the EPA agreed to settle the case and the parties entered into a consent decree, which provided that the residents would be permanently relocated into a non-segregated area of the city. Pro bono assistance from private firms was also instrumental in our Clemency Project in 2014, where the Lawyers' Committee worked with dozens of large law firms to help screen applications and submit

16

clemency petitions for those incarcerated for nonviolent drug offenses, who had no significant criminal histories or histories of violence, demonstrated good conduct in prison, and who served at least 10 years of their prison sentence. *See* U.S. Sent'g Comm'n, *An Analysis of the Implementation of the 2014 Clemency Initiative*, at 1 (Sept. 2017), available at https://tinyurl.com/3b64beee  ("Analysis of Clemency Initiative").

The local affiliates of the Lawyers' Committee engage in similar advocacy that is critically important for its focus on the needs of their local communities, and they likewise rely on the pro bono support of private law firms. *See, e.g.*, *Ocana v. Renew Fin. Holdings Inc.*, No. BC701809 (Cal. Super. Ct., L.A. Cnty. 2018) (Public Counsel partnering with private law firm to successfully challenge predatory home improvement loans); *William Penn Sch. Dist.*, 294 A.3d 537 (Public Interest Law Center partnering with pro bono counsel to successfully challenge Pennsylvania's school funding system as unconstitutional and in need of reform); *Coalition on Homelessness v. San Francisco*, No. CPF-18-516546, 2023 WL 12032691 (Cal. Super. Ct., S.F. Cnty. 2023) (private law firm partnered with LCCRSF in action prompting city to end practice of poverty-based vehicle towing); *Zirbel v. Wilmington Sch. Dist.*, No. 1:19-cv-04660 (N.D. Ill.) (CLC partnering with pro bono law firm on litigation challenging school district's failure to protect a student from racially motivated harassment); *2801 15th St. NW Unidos*, 2022-CA-001459-R(RP)

17

(Washington Lawyers' Committee partnering with private law firm to represent class of tenants affected by unsafe and unlawful housing conditions).

The Executive Orders' attacks on law firms based on the clients or ideas they represent will deter firms from taking on representation of anyone or anything the current president finds unfavorable. If the Court were to uphold these Executive Orders, the natural result would be that law firms would refrain from engaging in pro bono efforts for fear of retaliation. Going forward, the zealous pro bono advocacy that helped achieve successful outcomes in cases brought by Lawyers' Committee and its local affiliates may very well be unavailable.

## II. The District Courts Correctly Enjoined the Executive Orders, Which Have Caused Grave Harm to the Public Interest in Pro Bono Representation and the Pro Bono Bar.

All four district court judges correctly held that the injunctions against enforcement of the Executive Orders are strongly in the public interest. *See* JA1729 (issuing an injunction in the public interest to protect the "independence of counsel to represent their clients vigorously . . . without fear of retribution from the government"); JA2202 (in weighing the balance of the equities, acknowledging that "[t]he order's chilling effect is uniquely harmful for its focus on pro bono work."); JA3531–32 (concluding it is in the public interest to enjoin the Executive Order because it is unconstitutional and "threatens the independence of the bar."); JA2875 ("Enjoining the Order serves the public interest by, for example, preserving the

18

independent and adversarial nature of our judicial system."). For the Lawyers' Committee and its affiliates, the public interest in pro bono representation is of particular importance because it is central to the preservation of civil rights for the communities *amici* serve.

**A.    The Executive Orders Cause Grave Harm to Communities the Lawyers' Committee and Its Affiliates Serve.**

The consequences of the Executive Orders go well beyond the harm felt by appellees. The Executive Orders will continue to have a devastating impact on pro bono advocacy, or at least the kind with which the chief executive disagrees. *See* JA2202 ("The orders strongarm firms into redirecting their uncompensated services to work the President prefers—or even perhaps to work for the President himself."). Sanctioning a law firm for its representation of clients or advocacy necessarily means that those clients will not have access to their counsel of choice and will suffer, too. Yet unlike private, commercial clients, if a law firm stops its representation of pro bono clients, they may no longer have access to counsel *at all*. Beneficiaries of pro bono representation often come from communities who have been sidelined in this country and left without a voice, usually because they cannot afford the kind of zealous representation necessary to have a fair shot in our adversarial system. They will be harmed greatly by the fallout from law firms no longer taking on pro bono representation. *See id.* (noting that "[t]he public will suffer" when the government attempts, through these Executive Orders, "not only to

19

prevent th[e] noble undertaking [of pro bono service] but to manipulate it."). In particular, the communities of color and vulnerable populations whom the Lawyers' Committee and its local affiliates serve will be among the groups disproportionately hurt if the Executive Orders are upheld.

By punishing law firms for taking certain positions in advocating for their clients, the Executive Orders chills the exact advocacy the Lawyers' Committee, its local affiliates, and pro bono partners have championed for over sixty years. Consider the *McWaters* case. In 2005, Hurricane Katrina had a disproportionate impact on low income and minority households in Louisiana. Notably, about one in every three people who lived in areas hit hardest by Katrina were Black. *See* Arloc Sherman & Isaac Shapiro, *Essential Facts About the Victims of Hurricane Katrina*, Ctr. on Budget & Pol'y Priorities, (Sept. 19, 2005), http://www.cbpp.org/9-19-05pov.htm ("The Census data also confirm that African Americans made up a disproportionate share of the hurricane's victims. About one of every three people who lived in the areas hit hardest by the hurricane were African American. By contrast, one of every eight people in the nation is African American."). Nearly 100,000 people at the time of Katrina lived in "extreme poverty neighborhoods," where the average household income was just over $20,000 a year and nearly 55% of individuals fell below the poverty line. Alan Berube & Bruce Katz, *Katrina's Window: Confronting Concentrated Poverty Across America*, Brookings Inst., Oct.

20

2005, at 4, available at https://tinyurl.com/4d73mvbh. The Lawyers' Committee, in partnership with its local affiliate the Mississippi Center for Justice and a pro bono law firm, successfully sued FEMA for its failure to provide emergency assistance after the hurricane. *McWaters*, 408 F. Supp. 2d at 223. Additionally, within weeks of the Hurricane, the Lawyers' Committee worked with local organizations and outside pro bono counsel to establish a program designed to provide legal assistance to Katrina victims and to address the lack of affordable housing and discriminatory housing-related actions that violated civil rights laws. That advocacy on behalf of low-income Black Louisianans was made possible in part because law firms had the freedom to take on pro bono matters without the fear of retribution restraining them from representing what some may have perceived as controversial clients or causes.

Or consider the Lawyers' Committee's efforts in advancing the 2014 Clemency Project. Many federal inmates were serving life sentences for nonviolent drug offenses under federal sentencing laws that created unjustified and extreme racial disparities. With critical pro bono assistance from the private bar, the project resulted in nearly 1,700 federal inmates having their sentences commuted. Analysis of Clemency Initiative at 11. Were it not for pro bono assistance, these inmates may not have had access to the legal representation that ultimately led to their freedom.

For some *amici*, the number of law firms willing to take on matters involving the federal government has declined—a situation unlike that during prior

21

administrations. Indeed, some affiliate Lawyers' Committees have already experienced challenges obtaining pro bono support due to the flurry of retaliatory executive orders, directly impacting communities in need of legal advocacy. There is a persistent unmet need for pro bono assistance, and law firms that engage in pro bono work fill a critical role in closing that gap. Yet these constraints inevitably reduce *amici's* ability to engage in direct legal services, pursue impactful litigation, and take on matters involving the federal government. If law firms are deterred from engaging in pro bono work for fear of reprisal from a chief executive who does not agree with the mission of that work, it will harm the individuals and communities most in need of legal representation: those who must advocate for themselves against a hostile and powerful government that threatens their civil rights.

**B.    The Executive Orders Cause Grave Harm to the Pro Bono Bar.**

A particularly shocking pattern across these Executive Orders is the unabashed retaliation against law firms for the pro bono representations the firms have undertaken. *See* JA2012 (alleging the firm engages in "harmful activity through their powerful pro bono practices," and referencing representation of individuals affected by the current administration's policies on immigration, asylum, and gender equity); JA2719–20 (alleging WilmerHale "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States."); JA491 (alluding to Perkins Coie's pro bono representation of transgender military

personnel). There is no reasonable way to read the Executive Orders as anything other than retaliatory. *See* JA2835 ("The WilmerHale Order is, on its face, retaliation for the firm's protected speech. Indeed, § 1 outlines the motivations of the Order, including WilmerHale's pro bono practice . . . ."); *see also Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001) (Retaliatory actions "that would chill a person of ordinary firmness" include "prosecution, threatened prosecution, bad faith investigation, and legal harassment.").

It is unsurprising, then, that the Executive Orders have had a chilling effect on pro bono representation. JA2201–02 ("Retaliation against Jenner—and Covington & Burling, and Paul Weiss, and Perkins Coie, and WilmerHale, and Susman Godfrey—threatens retaliation against all. It casts a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government.") (citation omitted). For example, a Reuters investigation found that dozens of major law firms, concerned about retaliation, "scaled back pro bono work, diversity initiatives and litigation that could place them in conflict with the Trump administration," and that major law firms "pulled back sharply from litigation against the federal government." *See* Mike Spector et al., *How Trump's Crackdown on Law Firms Is Undermining Legal Defenses for the Vulnerable*, Reuters (Aug. 3, 2025), https://www.reuters.com/investigations/trumps-war-big-law-leads-firms-retreat-

pro-bono-work-underdogs-2025-07-31/ (highlighting that "[m]any firms are making a strategic calculation: withdraw from pro bono work frowned on by Trump, or risk becoming the next target."). In an analysis conducted by The Washington Post, large law firms represented plaintiffs in only 15% of cases challenging Executive Orders issued by the Trump Administration in the first 8 months of 2025, as compared to representing 75% of plaintiffs in such cases during the first 8 months of Trump's first term. Shayna Jacobs, Clara Ence Morse & Mark Berman, *Nation's Biggest Law Firms Back Off from Challenging Trump Policies*, Wash. Post (Oct. 26, 2025), https://www.washingtonpost.com/national-security/2025/10/26/smaller-law-firms-struggle-trump-administration-initiatives/.

The chilling effect has been felt so completely that large law firms have taken unusual steps to preemptively address the executive orders. Nine large law firms made deals with the Trump Administration before the Administration could even issue orders against them. *See* Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025), https://www.propublica.org/article/trump-law-firms-accountability-environment-police-lgbtq (explaining that law firms reached public settlements with the Trump Administration that included commitments from the firms to provide millions of dollars' worth of pro bono work for causes supported by the Trump Administration). Taken together, the firms have pledged nearly $1 billion in legal work supporting

Trump-favored causes. *Id.* And at least one law firm entered into a settlement agreement with the government to have a retaliatory order against it rescinded. *See* Exec. Order No. 14244, 90 Fed. Reg. 13685 (Mar. 21, 2025).

Coercive tactics such as these and the chill they have caused are unprecedented. "One of the highest services the lawyer can render to society is to appear in court on behalf of clients whose causes are in disfavor . . . ." Fuller & Randall, *Professional Responsibility*, 44 A.B.A. J. at 1216. Yet the Executive Orders seek to stifle that service. In doing so, the Executive Orders attack one of the basic principles of liberal democracies everywhere: that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Without the ability of lawyers to take on clients or causes unpopular with the Administration, our form of government and its guarantees suffer greatly. In no area of our justice system will this chilling effect have a greater adverse impact than pro bono advocacy.

## CONCLUSION

For the reasons set forth above, the Court should affirm each decision from the district court granting summary judgment and issuing declaratory and injunctive relief.


Dated: April 3, 2026                    Respectfully submitted,

                                        /s/ *Edward Caspar*
                                        Edward G. Caspar
                                            *Counsel of Record*
                                        Adria J. Bonillas
                                        LAWYERS' COMMITTEE FOR CIVIL
                                        RIGHTS UNDER LAW
                                        1500 K Street, NW, Suite 900
                                        Washington, D.C. 20005
                                        Phone: (202) 662-8600
                                        Fax: (202) 783-0857
                                        ecaspar@lawyerscommittee.org

                                        *Counsel for* Amici Curiae *Lawyers'
                                        Committee for Civil Rights Under Law et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of FED. R. APP. P. 29(A)(5) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and Circuit Rule 32(e), this document contains 5,695 words. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in proportionally spaced serif typeface (14-point Times New Roman) using Microsoft Word for Office 365.

*/s/   Edward Caspar*
Edward Caspar

## CERTIFICATE OF SERVICE

I certify that on April 3, 2026, I served this brief on all parties or their counsel of record through the CM/ECF system.

*/s/     Edward Caspar*
Edward Caspar