# United States Court of Appeals
# for the District of Columbia Circuit

---

### No. 25-5241

(Consolidated with 25-5265, 25-5277, 25-5310)

---

PERKINS COIE LLP,

*Plaintiff-Appellee,*

*v.*

UNITED STATES DEPARTMENT OF JUSTICE; FEDERAL COMMUNICATIONS COMMISSION; OFFICE OF MANAGEMENT AND BUDGET; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; OFFICE OF PERSONNEL MANAGEMENT; GENERAL SERVICES ADMINISTRATION; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; UNITED STATES OF AMERICA; PAMELA J. BONDI; ANDREA R. LUCAS; SCOTT KUPOR; STEPHEN EHEKIAN; TULSI GABBARD; ALL FEDERAL AGENCIES AND AGENCY HEADS; BRENDAN CARR; RUSSELL T. VOUGHT, in his official capacity as Acting Director,

*Defendants-Appellants.*

---

*On Appeal from the United States District Court for the District of Columbia Circuit in No. 1:25-cv-00716-BAH.*

---

## BRIEF OF *AMICUS CURIAE* COMMON CAUSE
## IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

GREGORY L. DISKANT
MARGARET M. O'NEIL
BASIL J. K. WILLIAMS
HOWARD H. KIM
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
gldiskant@pbwt.com
moneil@pbwt.com
bwilliams@pbwt.com
hkim@pbwt.com

*Counsel for Amicus Curiae Common Cause*

April 3, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Rule 28(a)(1) of the D.C. Circuit Rules, the undersigned certifies as follows:

(a)    **Parties and Amici.**  Except for *amici* America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Judicial Action Group, and Conservative Legal Defense and Education Fund, which filed an *amicus* brief in support of Defendants-Appellants in this Court on March 13, 2026, certain *amici* that have filed briefs in support of Plaintiffs-Appellees since March 27, 2026, and certain *amici* filing briefs today, all parties, intervenors, and *amici* appearing before the district court and in this Court to date are listed by reference in the Brief for Defendants-Appellants.

(b)    **Rulings Under Review.**  References to the rulings at issue appear in the Brief for Defendants-Appellants.

(c)    **Related Cases.**  This case has not previously been before this Court. This Court has consolidated *Perkins Coie LLP v. U.S. Department of Justice, et al.*, No. 25-5241, with three related appeals: *Jenner & Block LLP v. U.S. Department of Justice, et al.*, No. 25-5265; *Wilmer Cutler Pickering Hale and Door LLP v. Executive Office of the President, et al.*, No. 25-5277; and *Susman Godfrey LLP v. Executive Office of the President, et al.*, No. 25-5310.  It has also ordered that these

consolidated appeals be scheduled for oral argument on the same day and before the same panel as *Zaid v. Executive Office the President, et al.*, No. 26-5009.

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Common Cause is a non-profit corporation. Common Cause does not have a parent corporation, and no publicly held corporation owns any part of Common Cause.

All parties have consented to the filing of this *amicus* brief.

## CERTIFICATE REGARDING SEPARATE *AMICUS* BRIEF

Pursuant to D.C. Circuit Rule 29(d), *amicus curiae* Common Cause certifies that a separate brief is necessary to provide its unique perspective on how the Administration's Executive Orders targeting law firms have made it more difficult for legal advocacy organizations such as Common Cause to secure outside pro bono counsel and have changed the nature of those legal advocacy organizations' engagements with law firms. Common Cause's perspective will aid the Court's analysis of the chilling effect of the Executive Orders on law firms and the impact of the Executive Orders on the work of the legal advocacy organizations that law firms previously regularly represented pro bono.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................vi

STATEMENT OF INTEREST OF *AMICUS CURIAE*................................................1

SUMMARY OF ARGUMENT .................................................................................2

ARGUMENT ..........................................................................................................5

I.    Pro Bono Work is Integral to Our Nation's Value of Equal Justice. ..............5

II.   The Administration's Executive Orders Targeted Law Firms that
      Have Engaged in Pro Bono and Other Public-Interest Representations. ........8

III.  The Executive Orders Immediately Affected Law Firm Behavior. ..............10

      A.    Nine Major Law Firms Immediately Settled with the
            Administration and Allowed the Administration to Define "Pro
            Bono" to Serve Its Own Ends. ............................................................10

      B.    Other Major Law Firms Were So Cowed that They Feared to
            Join an Uncontroversial *Amicus* Brief.................................................16

IV.   The Executive Orders Have Made It More Difficult for Legal
      Advocacy Groups to Secure Outside Pro Bono Counsel. ............................20

V.    The Threat to Law Firms, Their Legal Advocacy Organization
      Clients, and Pro Bono Work Remains.........................................................25

CONCLUSION .....................................................................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Boumediene v. Bush*,
    553 U.S. 723 (2008)...............................................................................7

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)...............................................................................8

*Gideon v. Wainwright*,
    372 U.S. 335 (1963)...............................................................................6

*Groff v. DeJoy*,
    600 U.S. 447 (2023)...............................................................................8

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006)...............................................................................7

*Lawrence v. Texas*,
    539 U.S. 558 (2003)...............................................................................7

*Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*,
    490 U.S. 296 (1989)...............................................................................5

*Moore v. Harper*,
    600 U.S. 1 (2023)....................................................................................2

*O'Donnell v. Harris County*,
    892 F.3d 147 (5th Cir. 2018) ................................................................7

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    783 F. Supp. 3d 105 (D.D.C. 2025)......................................................6

*Rucho v. Common Cause*,
    588 U.S. 684 (2019)...............................................................................1

*Soto v. United States*,
    605 U.S. 360 (2025)...............................................................................8

*United States v. Windsor*,
    570 U.S. 744 (2013)...............................................................................8

## Other Authorities

*The 2025 Pro Bono Scorecard: National Report*, The American
    Lawyer (July 8, 2025),
    https://www.law.com/americanlawyer/2025/07/08/the-2025-pro-
    bono-scorecard-national-report/ ...................................................................7

Ben Protess, *More Than 500 Law Firms Back Perkins Coie in Fight
    With Trump*, N.Y. Times (Apr. 4, 2025),
    https://www.nytimes.com/2025/04/04/business/law-firms-perkins-
    coie-trump.html.................................................................................18, 19

Bruce R. Jacob, *Memories of and Reflections About* Gideon v.
    Wainwright, 33 Stetson L. Rev. 181 (2003).........................................................6

David Lat, *Brad Karp's Email To Paul Weiss About Its Deal With The
    Trump Administration*, Original Jurisdiction (Mar. 23, 2025),
    https://davidlat.substack.com/p/brad-karp-firmwide-email-to-paul-
    weiss-about-the-trump-administration-deal..........................................................11

The Editorial Board, *Nine Law Firms Surrendered. Four Law Firms
    Won.*, N.Y. Times (Mar. 3, 2026),
    https://www.nytimes.com/2026/03/03/opinion/law-firms-
    resistance-trump.html ...........................................................................11

Elizabeth Williamson, *Big Law Firms Bowed to Trump. A Core of
    'Little Guys' Jumped in to Fight Him.*, N.Y. Times (July 21, 2025),
    https://www.nytimes.com/2025/07/21/us/politics/trump-big-law-
    firms-fight.html..................................................................................25

Erin Mulvaney *et al., The Law Firms That Appeased Trump—and
    Angered Their Clients*, Wall St. J. (June 1, 2025),
    https://www.wsj.com/us-news/law/law-firms-trump-deals-clients-
    71b3616d?gaa_at=eafs&gaa_n=ASWzDAiaRgUTx-
    SG2mdYMQR1ABDlkzV0SM3RmhAgUsp0Xcz3x3rYMVA84lD
    uIQci5OU%3D&gaa_ts=683e..........................................................................12

Jack Newsham, *Big Law's biggest players are absent from brief
    opposing Trump's attacks on law firms,* Business Insider (Apr. 4,
    2025), https://www.businessinsider.com/trump-big-law-firms-
    didnt-sign-perkins-coie-brief-2025-4 ...............................................................19

Jeff Mason & Tom Hals, *Trump says he may ask top law firms to work for free on US trade deals*, Reuters (Apr. 11, 2025), https://www.reuters.com/world/us/trump-says-he-may-ask-top-law-firms-work-free-us-trade-deals-2025-04-10/ .................................................15

Jessica Silver-Greenberg *et al., Trump Allies Look to Benefit From Pro Bono Promises by Elite Law Firms*, N.Y. Times (May 25, 2025), https://www.nytimes.com/2025/05/25/business/trump-law-firms-pro-bono.html .................................................12, 13

Josh Dawsey *et al., Trump Ordered Justice Department Reversal on Law Firm Sanctions*, Wall St. J. (Mar. 11, 2026), https://www.wsj.com/politics/policy/trump-ordered-justice-department-reversal-on-law-firm-sanctions-f137f164?st=aJZYHP&reflink=desktopwebshare_permalink ...........................27

Justin Henry, *Big Law Mostly Sits Out Industry Response to Trump Orders*, Bloomberg Law (Apr. 4, 2025), https://news.bloomberglaw.com/business-and-practice/law-firms-back-perkins-coie-in-lawsuit-fighting-trump .................................................18, 19

Katelyn Polantz, *Trump's crackdown on law firms is chilling the future of pro bono legal work,* CNN (May 7, 2025), https://www.cnn.com/2025/05/07/politics/trump-law-firm-crackdown-pro-bono-work .................................................14

Kathyrn Rubino, *Biglaw's Trump Deals Have Chilling Effect On Pro Bono*, Above The Law (May 7, 2025), https://abovethelaw.com/2025/05/biglaws-trump-deals-have-chilling-effect-on-pro-bono/ .................................................21

Marc Elias, *Big Law walks away from democracy*, Democracy Docket (Jan. 5, 2026), https://www.democracydocket.com/opinion/big-law-walks-away-from-democracy/ .................................................22

Matthew Diller & Alexander A. Reinert, *The Second Circuit and Social Justice*, 85 Fordham L. Rev. 73 (2016) .................................................5

viii

Matthew Goldstein & Jessica Silver-Greenberg, *Some Giant Law Firms Shy Away From Pro Bono Immigration Cases*, N.Y. Times (May 6, 2025), https://www.nytimes.com/2025/05/06/business/trump-law-firms-pro-bono-immigration.html ...................................................................22

Michael Birnbaum, *Law firms refuse to represent Trump opponents in the wake of his attacks*, Washington Post (Mar. 26, 2025), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/ ...................................................................................................23

Michael S. Schmidt *et al., How a Major Democratic Law Firm Ended Up Bowing to Trump*, N.Y. Times (Mar. 21, 2025), https://www.nytimes.com/2025/03/21/us/politics/paul-weiss-trump.html.................................................................................................11

Michael S. Schmidt *et al., Two Big Law Firms Said to Be Doing Free Work for Trump Administration*, N.Y. Times (Aug. 20, 2025), https://www.nytimes.com/2025/08/20/us/politics/law-firms-free-work-trump-administration.html ..........................................................15

Mike Spector *et al., How Trump's crackdown on law firms is undermining legal defenses for the vulnerable*, Reuters (July 31, 2025), https://www.reuters.com/investigations/trumps-war-big-law-leads-firms-retreat-pro-bono-work-underdogs-2025-07-31......21, 23, 24, 29

Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025), https://www.propublica.org/article/trump-law-firms-accountability-environment-police-lgbtq ................................................12, 20, 23

@realDonaldTrump, Truth Social (Apr. 11, 2025, 12:21 PM), https://truthsocial.com/@realDonaldTrump/posts/114320245355397433.................................................................................................................12

Roy Strom, *Paul Weiss Deal With Trump Haunts Industry One Year Later*, Bloomberg Law (Mar. 19, 2026), https://www.bloomberglaw.com/product/blaw/bloomberglawnews/bloomberg-law-news/BNA%200000019d-014c-ddca-a9bf-614e7d190001?emailQueueID=e2882b97-0f7d-dafd-17aa-c24bbceb3d9d&senderID=50427342 ..............................................23

Ryan Lucas, *Trump attacks on law firms begin to chill pro bono work on causes he doesn't like,* National Public Radio (Apr. 13, 2025), https://www.npr.org/2025/04/13/g-s1-59497/trump-law-firms-pro-bono..................................................................................................22

Scott Graham, *Challenging the Bail System in Texas*, Law.com (Apr. 30, 2018), https://www.law.com/nationallawjournal/2018/04/30/susman-godfrey-goes-all-in-on-bail-reform/ ...............................................................7

Sujeet Indap, *Top US law firms balk at backing Perkins' challenge to Donald Trump Sanctions*, Financial Times (Mar. 30, 2025), https://www.ft.com/content/494a061a-ddc5-43cd-a855-7ced75447cc2 ...............................................................................................19

White House, *Addressing Risks from Jenner & Block* (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.........................................9

White House, *Addressing Risks from Paul Weiss* (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/.........................................11

White House, *Addressing Risks from Perkins Coie LLP* (Mar. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/..................................8

White House, *Addressing Risks from Susman Godfrey* (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-susman-godfrey/ ...............................9

White House, *Addressing Risks from WilmerHale* (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale/ ........................................9

White House, *President Trump Participates in an Unleashing American Energy Executive Order Signing Event*, at 25:55–26:40 (YouTube, Apr. 8, 2025), https://www.youtube.com/watch?v=yGoDK8bVB9k.................................16, 28

White House, *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/ ...............................................................................13

White House, *Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens* (Apr. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/ .......................15

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Common Cause is a nonpartisan, grassroots organization dedicated to fair elections, due process, and ensuring that government at all levels adheres to democratic principles and is responsive to the interests of the people. Founded by John Gardner in 1970 as a "citizens' lobby," Common Cause has over 1.5 million members and supporters nationwide and local organizations in twenty-three states.

Central to Common Cause's mission is protecting American democracy, including ensuring fair elections and an independent and impartial judiciary. To advance those interests and others, Common Cause regularly partners with law firms that provide free pro bono legal services. The value of these services is substantial. In fiscal year 2024, Common Cause received $8,304,627 in free legal services; in fiscal year 2025, pro bono services totaled approximately $5,731,580.

Common Cause's pro bono partnerships with law firms have resulted in some of the country's most important public-interest cases. As examples, Common Cause was represented by volunteer outside counsel in *Rucho v. Common Cause*, 588 U.S.

---

[1] All parties have consented to the filing of this *amicus* brief. In accordance with Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *amicus curiae* affirms that no person or entity other than *amicus curiae* and its counsel authored this brief in whole or in part, and that no person or entity other than *amicus curiae* and its counsel contributed money intended to fund the preparation or submission of this brief.

684 (2019), in which it challenged the constitutionality of partisan gerrymandering, and in *Moore v. Harper*, 600 U.S. 1 (2023), in which the Supreme Court rejected the so-called "independent state legislature" theory. Those cases, and many others, were resource-intensive litigations that Common Cause could not have undertaken without the help of private law firms.

Given its longstanding reliance on pro bono partnerships with law firms, Common Cause has a concrete stake in this appeal. As explained below, the Executive Orders at issue have chilled law firms' willingness to take on cases adverse to the Administration, making it more difficult for Common Cause and other legal advocacy organizations to secure representation.

Common Cause respectfully requests that this Court affirm the district courts' orders finding that the Executive Orders are unconstitutional. An affirmance will rightfully make clear that the Administration may not retaliate against lawyers for the cases they take, nor commandeer those firms' pro bono programs to further the Administration's political priorities.

## SUMMARY OF ARGUMENT

The Administration's Executive Orders (the "EOs") threaten not only law firms, but also the pro bono work they provide and the legal advocacy organizations with whom they regularly partner. Those legal advocacy organizations are many. In addition to *amicus* Common Cause, they include, for example, the NAACP Legal

Defense Fund, the ACLU, the Brennan Center, the Southern Coalition for Social Justice, the Asian American Legal Defense Fund, the Center for Reproductive Rights, the Campaign Legal Center, the Lawyers' Committee for Civil Rights Under Law, Public Citizen, and the Legal Aid Society.

These public interest entities engage in litigation to safeguard individual rights, protect vulnerable communities, and advance social justice causes. They regularly partner with private law firms to do so. But the Administration's EOs impede the ability of legal advocacy organizations to retain law firms as outside pro bono counsel, making fraught the relationships between law firms and their pro bono organizational partners.

To understand the breadth and nature of these consequences and to prepare this brief, we held discussions with leaders of public-interest organizations, including some of those listed above, reviewed relevant public reporting, and attended panel discussions on the effects of the EOs. In order to encourage cooperation, we promised those with whom we spoke anonymity.[2] Those sources revealed several patterns regarding the EOs' chilling effect on law firms and the corresponding changed dynamic between law firms and the legal advocacy organizations with whom they partner.

---

[2] Where there is no citation in this brief for a factual statement, its source is in one or more of these anonymous conversations.

3

The first-order effect of the EOs was an immediate chill on law firms' willingness to be adverse to the Administration for fear that they, too, would be targeted. Some law firms that were targeted by EOs, or that feared being targeted, settled with the Administration. The impact of the EOs and the settlements was widely felt throughout the legal industry, particularly in the Nation's largest law firms whose willingness to litigate against the Administration plunged.

Critical to organizations like Common Cause, this caused a second-order effect. It is now more difficult, and sometimes impossible, for legal advocacy groups like Common Cause to retain law firms as outside pro bono counsel. Indeed, multiple law firms that sued the Trump Administration in the President's first term have not done so in his second. And even when pro bono counsel can be found, legal advocacy organizations have had to spend more time and resources to do so. Meanwhile, fear of the Administration has actually led some firms to request that the names of their firms and lawyers not appear on briefs they draft.

Although the EOs were issued more than one year ago, the threats that they present remain. The targeted law firms prevailed decidedly in the district court; every EO that was challenged was enjoined. Even so, the very pendency of this appeal and the circuitous route it has taken—including the public reinstation of the appeal at the President's personal direction—proves that the threat of vindictive action against law firms and their not-for-profit partners has not gone away.

This appeal therefore provides the Court with an opportunity to say definitively that the Constitution precludes the Administration's attempt to dictate what clients law firms can represent, what lawyers they can hire, and what cases they can take on, while hindering the ability of legal advocacy organizations to partner with counsel of their choice.

## ARGUMENT

### I.    Pro Bono Work is Integral to Our Nation's Value of Equal Justice.

At the Legal Aid Society of New York's seventy-fifth anniversary celebration, Judge Learned Hand remarked, "If we are to keep our democracy, there must be one commandment:  Thou shalt not ration justice."[3]  But ensuring equal justice under the law is untenable without equal access to the law, and equal access is impossible without affordable, widespread legal representation.

For that reason, providing pro bono legal services is an essential responsibility of all lawyers.  As the U.S. Supreme Court observed in 1989, "[i]n a time when the need for legal services among the poor is growing and public funding for such services has not kept pace, lawyers' ethical obligation to volunteer their time and skills pro bono publico is manifest."  *Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989).

---

[3] *See* Matthew Diller & Alexander A. Reinert, *The Second Circuit and Social Justice*, 85 Fordham L. Rev. 73, 110 (2016) (citing Learned Hand, *Thou Shalt Not Ration Justice*, 9 Legal Aid Brief Case, Apr. 1951, at 3, 5).

The centrality of pro bono work to legal practice is enshrined in the Rules of Professional Responsibility. ABA Model Rule 6.1 states, "Every lawyer has a professional responsibility to provide legal services to those unable to pay." In addition to providing pro bono services to "persons of limited means," that responsibility includes service to "charitable, religious, civic, community, governmental and education organizations in matters which are designed primarily to address the needs of persons of limited means." It also includes legal services for "individuals, groups or organizations seeking to secure or protect civil rights, civil liberties or public rights."

The tradition of pro bono representation, particularly representation of unpopular persons or causes, dates back to the Founding Era. John Adams represented pro bono British soldiers who were accused in the Boston Massacre. *See Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 119 (D.D.C. 2025) (citing 3 Diary and Autobiography of John Adams 293 (L.H. Butterfield et al. eds., 1961)). Almost two centuries later, the U.S. Supreme Court appointed future Justice Abe Fortas to represent Clarence Gideon in *Gideon v. Wainwright*, 372 U.S. 335 (1963).[4]

---

[4] *See* Bruce R. Jacob, *Memories of and Reflections About* Gideon v. Wainwright, 33 Stetson L. Rev. 181, 224 (2003).

This tradition has continued to the present.  All four appellee law firms have active pro bono practices.  WilmerHale represented the petitioners pro bono in *Boumediene v. Bush*, 553 U.S. 723 (2008).  Perkins Coie represented habeas petitioners pro bono in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006).  Jenner & Block partnered with Lambda Legal Defense in challenging the constitutionality of state sodomy laws in *Lawrence v. Texas*, 539 U.S. 558 (2003).  And Susman Godfrey has partnered frequently with legal services organizations like the ACLU and the Civil Rights Corps in bringing a wide range of pro bono cases involving constitutional and human rights issues.  *See, e.g.*, *O'Donnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018).

All four firms have also been recognized for their pro bono work.  *See The 2025 Pro Bono Scorecard:  National Report*, The American Lawyer (July 8, 2025), https://www.law.com/americanlawyer/2025/07/08/the-2025-pro-bono-scorecard-national-report/ (ranking Jenner first, WilmerHale third, and Perkins Coie twenty-seventh in the "pro bono scorecard"); Scott Graham, *Challenging the Bail System in Texas*, Law.com (Apr. 30, 2018), https://www.law.com/nationallawjournal/2018/04/30/susman-godfrey-goes-all-in-on-bail-reform/ (recognizing Susman Godfrey in the National Law Journal's "Pro Bono Hot List").

As suggested by the cases cited above, it is commonplace in pro bono litigation for law firms to partner with legal advocacy organizations like Common

Cause. For example, in *United States v. Windsor*, 570 U.S. 744 (2013), Paul, Weiss attorneys partnered with the ACLU and the NYCLU in challenging provisions of the Defense of Marriage Act regarding same-sex couples. *See also, e.g.*, *Soto v. United States*, 605 U.S. 360 (2025) (partnership between Sidley Austin and National Veterans Legal Services Program); *Groff v. DeJoy*, 600 U.S. 447 (2023) (partnership between Baker Botts and First Liberty Institute); *Dep't of Com. v. New York*, 588 U.S. 752 (2019) (partnership between Arnold & Porter and ACLU).

## II. The Administration's Executive Orders Targeted Law Firms that Have Engaged in Pro Bono and Other Public-Interest Representations.

The EOs at issue in this appeal take direct aim at law firms' rich tradition of pro bono and public-interest work. The EOs target—seek to punish—four law firms for engaging in pro bono or public-interest work adverse to the positions of the Administration, or for at one time employing lawyers that the President did not like. For example, the EO targeting Appellee Perkins Coie focuses on work done for presidential candidate Hillary Clinton and frequent Democratic political donor George Soros.[5] This work was led by former partner Marc Elias, who was no longer at Perkins by the time of the EO.

---

[5] White House, *Addressing Risks from Perkins Coie LLP* (Mar. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/.

The EO targeting Appellee Jenner & Block complained that one of its former partners, Andrew Weissman, after leaving Jenner, worked at the Department of Justice in Robert Mueller's investigation of alleged Russian interference in the 2016 presidential election.  It also accused the firm of "abus[ing]" its pro bono practice by representing the rights of transgender persons and immigrants.[6]

Robert Mueller's investigation was also center stage in the EO against Appellee WilmerHale, which accused that firm of "reward[ing] Robert Mueller and his colleagues . . . by welcoming them to the firm" after their investigation was complete.[7]

The EO against Appellee Susman Godfrey accused it of "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections."[8]  The government has conceded that the reference to allegedly degrading the quality of American elections was a reference to the firm's work in representing Dominion Voting Systems in obtaining a $787.5 million defamation settlement from

---

[6] White House, *Addressing Risks from Jenner & Block* (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.

[7] White House, *Addressing Risks from WilmerHale* (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale/.

[8] White House, *Addressing Risks from Susman Godfrey* (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-susman-godfrey/.

Fox News for falsely reporting that Dominion had rigged the 2020 election. *See* JA3506–07.

These EOs stripped all lawyers at those firms of their security clearances, barred government contractors from employing the firms, and even limited firm personnel from entering federal government buildings.

The four Appellee law firms, responding to the government's flagrant retaliation against them for protected First Amendment activity, sued the Administration. The law firms asserted multiple constitutional flaws in the EOs, including that the EOs violated their First Amendment rights of expression and association, and their right to petition the government for redress.

Within days of filing lawsuits, each firm obtained a preliminary injunction temporarily barring enforcement of the EOs. Then, in four separate decisions, four different district court judges granted the law firms' motions for summary judgment, permanently enjoining enforcement of the EOs. The government appealed those decisions to this Court.

III.  **The Executive Orders Immediately Affected Law Firm Behavior.**

  A.  **Nine Major Law Firms Immediately Settled with the Administration and Allowed the Administration to Define "Pro Bono" to Serve Its Own Ends.**

The EOs generated a sense of panic—of genuine fear—among the Nation's law firms that the President's threats would literally drive them out of business. Nine

law firms immediately settled with the Administration, either to resolve or prevent EOs targeting them.  The first was Paul, Weiss.  On March 14, 2025, President Trump issued an EO targeting Paul, Weiss for, among other transgressions, formerly employing Mark Pomerantz, who was later involved in the Manhattan District Attorney's investigation of the President.[9]  Paul, Weiss' then-Chair Brad Karp described the EO as an "existential crisis" that "brought the full weight of the government down on [the] firm" and "could easily have destroyed [the] firm."[10]

Karp then met with President Trump and reached a settlement in which Paul, Weiss agreed, among other things, to commit to $40 million in pro bono legal services for initiatives backed by the President.[11]  Eight other law firms agreed to similar settlement terms, with the dollar value of the donated legal services rising to $100 million or $125 million per firm.[12]

---

[9] White House, *Addressing Risks from Paul Weiss* (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/.

[10] David Lat, *Brad Karp's Email To Paul Weiss About Its Deal With The Trump Administration*, Original Jurisdiction (Mar. 23, 2025), https://davidlat.substack.com/p/brad-karp-firmwide-email-to-paul-weiss-about-the-trump-administration-deal.

[11] Michael S. Schmidt *et al.*, *How a Major Democratic Law Firm Ended Up Bowing to Trump*, N.Y. Times (Mar. 21, 2025), https://www.nytimes.com/2025/03/21/us/politics/paul-weiss-trump.html.

[12] *See* The Editorial Board, *Nine Law Firms Surrendered.  Four Law Firms Won.*, N.Y. Times (Mar. 3, 2026), https://www.nytimes.com/2026/03/03/opinion/law-firms-resistance-trump.html.

The fear generated by the EOs, and the settlements, immediately impacted these and other law firms' decisions whether to represent certain clients, work on certain cases, and publicly take certain positions adverse to the Administration. Kirkland & Ellis, for example, partnered with Lambda Legal challenging President Trump's transgender military ban during his first term, but is "notably absent from Lambda's nearly identical challenge" to the reinstated ban in the President's second term.[13]  Indeed, the *Wall Street Journal* reported that Deputy White House Chief of Staff Stephen Miller believed that the threat of future executive orders would "dissuade the best lawyers from representing critics of the administration."[14]

To be sure, the nine settlement agreements contemplate that the settling firms will provide millions of dollars in pro bono work.  But the President has his own definition of that, and it includes only specific subject matters he favors.[15]  This *New York Times* headline captures the one-sided effect of the settlements:  "*Trump Allies*

---

[13] *See* Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025), https://www.propublica.org/article/trump-law-firms-accountability-environment-police-lgbtq.

[14] Erin Mulvaney *et al.*, *The Law Firms That Appeased Trump—and Angered Their Clients*, Wall St. J. (June 1, 2025), https://www.wsj.com/us-news/law/law-firms-trump-deals-clients-71b3616d?gaa_at=eafs&gaa_n=ASWzDAiaRgUTx-SG2mdYMQR1ABDlkzV0SM3RmhAgUsp0Xcz3x3rYMVA84lDuIQci5OU%3D&gaa_ts=683e.

[15] These include assisting veterans, military, law enforcement, and government officials.  *See, e.g.*, @realDonaldTrump, Truth Social (Apr. 11, 2025, 12:21 PM), https://truthsocial.com/@realDonaldTrump/posts/114320245355397433.

*Look to Benefit From Pro Bono Promises by Elite Law Firms*."[16]  Meanwhile, the Administration has made clear that disfavored pro bono efforts could be met with further punishment.

Indeed, the risks to non-compliant law firms, even settling firms, was accentuated on March 22, 2025, when the White House issued a memorandum purportedly to address abuses of the legal system (the "March 2025 Memorandum").[17]  The March 2025 Memorandum claims that "grossly unethical misconduct [is] far too common" among lawyers and alleges (without citing any factual support) that "powerful Big Law pro bono practices" actively suborn perjury in litigation against the federal government.  It asks the Attorney General to review attorney conduct over the past eight years and, if she decides that any prior law firm actions were, among other things, "unreasonable," to recommend sanctions to the President.  Those sanctions can include "reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services."[18]  These are the kind of sanctions— for the sin of zealously representing a client against the federal government—that

---

[16] Jessica Silver-Greenberg *et al.*, *Trump Allies Look to Benefit From Pro Bono Promises by Elite Law Firms*, N.Y. Times (May 25, 2025), https://www.nytimes.com/2025/05/25/business/trump-law-firms-pro-bono.html.
[17] White House, *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.
[18] *Id.*

were utilized in the challenged EOs.  The March 2025 Memorandum still appears on the White House website.

The practical effect of these actions by the Administration, and the fear they engendered, is that firms have diverted legal resources away from pro bono matters that might anger the President.  For example, within hours of its settlement, Paul, Weiss ended its long-standing partnership with civil-rights organization League of United Latin American Citizens ("LULAC").[19]  (Paul, Weiss would later reverse course with respect to LULAC,[20] apparently lulled, or embarrassed, by the success of Appellees in challenging the President—a false sense of security, we fear, *see infra* Section V.)

The President cannot use threats to commandeer private entities to provide legal services for causes that he personally supports or to do work for the government.  But that appears to be happening.  On April 28, 2025, the President's Executive Order 14288 directed the Attorney General "to create a mechanism to provide legal resources . . . to law enforcement officers" in certain circumstances,

---

[19] Katelyn Polantz, *Trump's crackdown on law firms is chilling the future of pro bono legal work*, CNN (May 7, 2025), https://www.cnn.com/2025/05/07/politics/trump-law-firm-crackdown-pro-bono-work.

[20] *See id.*

including by enlisting "private-sector pro bono assistance for such law enforcement officers."[21]

Going far beyond any definition of "pro bono," it is reported that the President is asking some of the settling law firms to provide free work for the Administration itself. Reportedly, Paul, Weiss, Kirkland & Ellis, and Skadden Arps are all assisting the Commerce Department on trade deals on behalf of the Administration.[22] The President has exulted over this result: "[W]e have a lot of law firms that have paid me a lot of money in the form of legal fees. . . . I think we're going to try to use these very prestigious firms to help us out with the trade."[23]

The President also wants to coerce the settling firms to provide free work for what he calls "America's Beautiful Clean Coal Industry." During an April 8, 2025 White House event, President Trump proudly boasted to coal-industry leaders about the law firms that have been "signing up with Trump" and promised that "we're

---

[21] White House, *Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens* (Apr. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-and-unleashing-americas-law-enforcement-to-pursue-criminals-and-protect-innocent-citizens/.

[22] *See* Michael S. Schmidt *et al.*, *Two Big Law Firms Said to Be Doing Free Work for Trump Administration*, N.Y. Times (Aug. 20, 2025), https://www.nytimes.com/2025/08/20/us/politics/law-firms-free-work-trump-administration.html.

[23] Jeff Mason & Tom Hals, *Trump says he may ask top law firms to work for free on US trade deals*, Reuters (Apr. 11, 2025), https://www.reuters.com/world/us/trump-says-he-may-ask-top-law-firms-work-free-us-trade-deals-2025-04-10/.

15

going to use some of those firms to work with you on your leasing and your other things, and they'll do a great job."[24]

### B.    Other Major Law Firms Were So Cowed that They Feared to Join an Uncontroversial *Amicus* Brief.

The chill extended throughout the legal community, well beyond the settling law firms. This was most evident in the dramatic failure of the legal industry to stand together in opposition to the EOs. In the district court, former Solicitor General Donald B. Verrilli, Jr. of Munger Tolles & Olsen took responsibility for putting together an *amicus* brief on behalf of the bar. The task did not seem challenging; it should not have been difficult to get near universal agreement on a short brief reiterating basic rule-of-law truisms that the EOs violated. The *amicus* brief was only five pages long and made seemingly indisputable statements about the law and the effects of the EOs that most any first-year law student would endorse. For example:

- "[A]ny controversial representation challenging actions of the current administration (or even causes it disfavors) now brings with it the risk of devastating retaliation."

- "Checking federal government overreach, whether it be infringements on religious liberty, assaults on the freedom of the press, or burdensome regulation, is a vital part of what *amici* [law firms] and others like them are called to do."

---

[24] White House, *President Trump Participates in an Unleashing American Energy Executive Order Signing Event*, at 25:55–26:40 (YouTube, Apr. 8, 2025), https://www.youtube.com/watch?v=yGoDK8bVB9k.

- "Like every lawyer, the members of the *amicus* law firms have sworn an oath to uphold the Constitution and to discharge the obligations of the profession to the best of our ability.  That oath obligates all of us, no matter our political views, to be faithful custodians of our Nation's commitment to the rule of law . . . [and] to stand up now to the unprecedented threat posed by the Executive Order at issue in this case and the others like it."

*See, e.g.*, Br. of *Amici Curiae* 518 Law Firms in Support of Pl.'s Mot. for Summ. J. ¶¶ 2, 3, 5, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 1:25-cv-00716-BAH (Apr. 7, 2025), ECF No. 82.

Endorsing such relatively fundamental statements about our constitutional system should not have been a challenge for any member of the bar.  The statements were strongly endorsed by the American Bar Association, which filed its own lawsuit regarding the EOs.  And by the time the brief was filed, district courts had found three of the EOs obviously unconstitutional and issued TROs against them; a TRO against the fourth came shortly thereafter.  One might have expected that the organized bar—especially the most powerful firms—would stand in solidarity with their beleaguered colleagues by signing onto the *amicus* brief.

That was not the case.  During the period from April 7, 2025 through April 25, 2025, *amicus* briefs were filed in all four actions.[25]  Over that period, the number

---

[25] *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716 (D.D.C. Apr. 7, 2025), ECF No. 82; *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 1:25-cv-916 (D.D.C. Apr. 11, 2025), ECF No. 45; *See Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of the President*, No. 1:25-cv-917 (D.D.C. Apr. 11, 2025), ECF No. 39;

of *amici* grew from 518 to 884 law firms, but those firms were generally small or midsized. Shockingly, the Nation's largest firms sat on the sidelines, unwilling to make even the mildest statements in favor of the rule of law.

Not one of the country's twenty-five highest-grossing firms joined the initial brief filed in the Perkins Coie case, and only eight of the 100 highest-grossing firms signed.[26] Three of the eight were firms directly impacted by the EOs (Jenner, WilmerHale, and Susman Godfrey). The second highest-grossing 100 firms similarly abstained; only six of those firms signed the *amicus* brief. Two were Munger Tolles, an author of the brief, and Patterson Belknap, the undersigned counsel.

The reasons the firms provided for not joining the *amicus* brief were variants on the same theme. Some firms said they wanted to sign the brief but were afraid to "draw Mr. Trump's ire and cost them clients."[27] Some claimed that joining the brief

---

*Susman Godfrey v. Exec. Off. of the President*, No. 1:25-cv-1107 (D.D.C. Apr. 25, 2025), ECF No. 105.

[26] *See* Justin Henry, *Big Law Mostly Sits Out Industry Response to Trump Orders*, Bloomberg Law (Apr. 4, 2025), https://news.bloomberglaw.com/business-and-practice/law-firms-back-perkins-coie-in-lawsuit-fighting-trump.

[27] Ben Protess, *More Than 500 Law Firms Back Perkins Coie in Fight With Trump*, N.Y. Times (Apr. 4, 2025), https://www.nytimes.com/2025/04/04/business/law-firms-perkins-coie-trump.html.

"would not meaningfully help Perkins Coie."[28]  Still others expressed support for the brief, but only if "their closest peers [would] also sign the brief."[29]

Bloomberg Law reported that "[m]ost of the big firms wouldn't sign unless a critical mass of peers did so as well."[30]  That was the heart of the problem.  In a surreal spectacle, the firms would not even talk to one another about whether they would sign the *amicus* brief.  Instead, a mediator was engaged to deal with the firms independently, anonymizing their responses to maintain confidentiality.[31]  One drafter of the *amicus* brief said that he was unaware what firms would be signatories until shortly before the brief was filed because the process was so highly confidential.[32]  And even so, in the end, very few of the largest firms signed.

More than anything else, this embarrassing episode demonstrates the dramatic effect of President Trump's illegal EOs on a group whose power and fearlessness in litigation once earned them the sobriquet of Lions in the Street.[33]

---

[28] *See id.*

[29] Sujeet Indap, *Top US law firms balk at backing Perkins' challenge to Donald Trump Sanctions*, Financial Times (Mar. 30, 2025), https://www.ft.com/content/494a061a-ddc5-43cd-a855-7ced75447cc2.

[30] *See* Henry, *supra* note 26.

[31] *See* Indap, *supra* note 29.

[32] Jack Newsham, *Big Law's biggest players are absent from brief opposing Trump's attacks on law firms*, Business Insider (Apr. 4, 2025), https://www.businessinsider.com/trump-big-law-firms-didnt-sign-perkins-coie-brief-2025-4.

[33] We understand that there will be a new *amicus* brief filed by law firms opposing the EOs on this appeal.  We hope it will have more signatories from Big Law.

**IV.    The Executive Orders Have Made It More Difficult for Legal Advocacy Groups to Secure Outside Pro Bono Counsel.**

The EOs' chilling effect on law firms, in turn, has hampered the ability of legal advocacy organizations like Common Cause to retain law firms as pro bono counsel.    Indeed, they have even made it difficult for paying clients "willing to pay the firms' steep rates" to find a lawyer who will sue the Administration.[34] Immediately after the EOs were issued, several law firms reneged on pro bono commitments to legal advocacy organizations.    For example, before the EOs, one firm had signed an engagement letter with a legal advocacy organization and was set to file a motion for a preliminary injunction against a different executive order.    But the morning after the first EO, the firm decided that it could no longer publicly bring that lawsuit.    Similarly, before the EOs, a different legal advocacy organization had secured representation from a law firm in an immigration case.    Two days after the first EO, the firm backed out.

These withdrawals were not isolated incidents.    One need only compare the President's first and second terms to see the link between the EOs and the decline in the willingness of large law firms to sue the Administration.    According to an extensive analysis by *Reuters*, twenty of the 100 highest-grossing law firms in the United States sued the Trump Administration during his first term but have not done

---

[34] *See* Redden, *supra* note 13.

20

so in the same period in his second term.[35]  Goodwin Procter, for example, reportedly litigated fifteen lawsuits against the first Trump Administration but has not initiated any similar cases in his second term.[36]

Because of the EOs, some legal advocacy organizations have been unable to find outside pro bono counsel.  Following the EOs, fourteen civil rights groups said that "law firms they count on to pursue legal challenges . . . hesitat[ed] to engage with them, ke[pt] their representation secret or turn[ed] them down altogether."[37] One law firm partner said, "I know from talking to organizations, they are having a hell of a time finding firms to partner with.  Firms are really gun shy to take on cases that may upset the administration."[38]  As one example, Dustin Rynders, Legal Director of the Texas Civil Rights Project, reported that he has been "turned down on some recent requests where people have expressed concern about political ramifications, about being involved in immigrant rights work in this time, about

---

[35] *See* Mike Spector *et al.*, *How Trump's crackdown on law firms is undermining legal defenses for the vulnerable*, Reuters (July 31, 2025), https://www.reuters.com/investigations/trumps-war-big-law-leads-firms-retreat-pro-bono-work-underdogs-2025-07-31.

[36] *See id.*

[37] *See id.*

[38] Kathryn Rubino, *Biglaw's Trump Deals Have Chilling Effect On Pro Bono*, Above The Law (May 7, 2025), https://abovethelaw.com/2025/05/biglaws-trump-deals-have-chilling-effect-on-pro-bono/.

being involved in civil rights, voting rights cases, in challenges against the administration."[39]

Legal advocacy organizations' challenges in securing counsel have meant that some cases that would otherwise be brought against the Administration are simply not being brought. For example, one public-interest law firm that wanted to bring a case challenging a Florida election law never brought the case because it could not find a firm that was willing to work on it in time to file a lawsuit, despite searching for months.

Certain subject matters have taken a particularly drastic hit in pro bono engagement by law firms. Firms seem reluctant to take on cases critical to Common Cause's mission, such as voting rights and other election law cases.[40] Similarly, following the EOs, the number of large law firms willing to take on immigration matters pro bono has declined.[41] *Reuters* has reported that in the President's second

---

[39] Ryan Lucas, *Trump attacks on law firms begin to chill pro bono work on causes he doesn't like*, National Public Radio (Apr. 13, 2025), https://www.npr.org/2025/04/13/g-s1-59497/trump-law-firms-pro-bono.

[40] *See* Marc Elias, *Big Law walks away from democracy*, Democracy Docket (Jan. 5, 2026), https://www.democracydocket.com/opinion/big-law-walks-away-from-democracy/.

[41] *See* Matthew Goldstein & Jessica Silver-Greenberg, *Some Giant Law Firms Shy Away From Pro Bono Immigration Cases*, N.Y. Times (May 6, 2025), https://www.nytimes.com/2025/05/06/business/trump-law-firms-pro-bono-immigration.html.

term, the top 100 firms have handled only a small fraction of the immigration lawsuits that they handled during the same time period in his first term.[42]

Firms have also declined to represent individuals in the President's crosshairs. Winston & Strawn reportedly declined to represent FBI agents sanctioned because of their involvement in investigations of the January 6 Capitol attack.[43]  Other firms have reportedly hesitated to represent "elected Democrats and federal workers purged in Trump's war on the 'deep state.'"[44]  Likewise, "Biden-era officials" say they are "having trouble finding lawyers willing to defend them."[45]

Even when legal advocacy organizations have been able to retain pro bono counsel, the process has required more time, effort, and resources.  For example, one legal advocacy organization explained that before the EOs it typically could retain a law firm for impact litigation in just a few hours, but that lining up law firms now takes much longer.  It took one public-interest law firm over a month to find a partner

---

[42] *See* Spector, *supra* note 35; *see also* Roy Strom, *Paul Weiss Deal With Trump Haunts Industry One Year Later*, Bloomberg Law (Mar. 19, 2026), https://www.bloomberglaw.com/product/blaw/bloomberglawnews/bloomberg-law-news/BNA%200000019d-014c-ddca-a9bf-614e7d190001?emailQueueID=e2882b97-0f7d-dafd-17aa-c24bbceb3d9d &senderID=50427342 ("Many Big Law firms have shied away from pro bono causes, particularly involving immigration issues.").

[43] *See* Redden, *supra* note 13.

[44] *See id.*

[45] Michael Birnbaum, *Law firms refuse to represent Trump opponents in the wake of his attacks*, Washington Post (Mar. 26, 2025), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/.

private law firm in a redistricting case.  Another organization reported that, on several occasions, it had spent weeks to find a law firm just to work on a brief.  The extra time and effort required for an organization to secure legal representations is time not spent furthering the organization's mission.

Beyond delays in securing counsel, the EOs have also changed the nature of engagements between legal advocacy groups and their outside counsel.  In a frightening display of how the EOs have intimidated the legal community, some firms have agreed to work only if the name of the firm and its lawyers do not appear on the briefs they write.  Indeed, one law firm asked a legal advocacy organization whether it could ensure that the law firm's name would not even appear in the organization's *internal files*.  An experienced executive director of an advocacy group had never before seen an anonymity provision in a pro bono engagement agreement, but now they are not uncommon.[46]  While illustrating the sense of panic among law firms, this hurts the clients the firms purport to represent.  As several legal organization representatives have noted, identifying the names of major law firms on briefs adds credibility to their claims.

Changes in these engagements have even extended to their financial terms, leading to cost-sharing arrangements that would not have occurred previously.  In an election law case, for example, one large law firm was willing to partner with a

---

[46] Spector, *supra* note 35.

small public-interest law firm, but only if the public-interest law firm would bear all the costs—a burden that the public-interest law firm could not bear.  In a different case, another large law firm asked the small public-interest law firm to split costs over a certain amount, an arrangement to which the public-interest firm begrudgingly agreed.

These increased obstacles to obtaining legal representation have also changed the way that legal advocacy organizations go about their litigation work.  In response to the increased difficulty of partnering with large law firms, legal advocacy organizations have sought partnerships with new law firms, including solo practitioners and small law firms who may not have relevant legal expertise or resources.[47]  Moreover, when conducting outreach to law firms, organizations now tend to make a request to several law firms at the same time, as opposed to reaching out to firms one at a time, adding logistical complications the organization must work through.

## V.    The Threat to Law Firms, Their Legal Advocacy Organization Clients, and Pro Bono Work Remains.

The Administration's EOs were issued more than one year ago, and four of the largest and most prestigious law firms in the country fought back and won

---

[47] *See* Elizabeth Williamson, *Big Law Firms Bowed to Trump.  A Core of 'Little Guys' Jumped in to Fight Him.*, N.Y. Times (July 21, 2025), https://www.nytimes.com/2025/07/21/us/politics/trump-big-law-firms-fight.html.

resoundingly in the district court. In the months since, the government has suggested that its coercive campaign against law firms may be over. In moving to dismiss a related suit brought by the American Bar Association, the government emphasized that there was no "concrete indication that [another] EO is forthcoming." *See Am. Bar. Assoc. v. Exec. Off. of the President*, No. 1:25-cv-1888 (D.D.C. Aug. 8, 2025), ECF No. 22-1 at 20. Of course, the March 2025 Memorandum remains in effect, directing the Attorney General to identify firms for retribution including "reassessment of security clearances" and "termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services."[48]

But more importantly, this appeal itself disproves the notion that President Trump no longer poses a threat to law firms and their non-profit partners. The government knows this appeal is a losing proposition. It did not file a prompt appeal and did not seek a stay of the district court orders in either this Court or the Supreme Court. Once the appeal was filed, the government slow-walked the briefing schedule. Last October, the government requested a delay in briefing because of a government shutdown. *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-5241 (D.C. Cir. Oct. 6, 2025), ECF No. 2138841. The shutdown ended in November, but

---

[48] White House, *Preventing Abuses of the Legal System and the Federal Court*, *supra* note 17.

there was no briefing schedule until February 2026. *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-5241 (D.C. Cir. Feb. 6, 2026), ECF No. 2157928.

Just four days before its brief was due on March 6, 2026, the government filed an unexplained motion to voluntarily dismiss the cases. *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-5241 (D.C. Cir. Mar. 2, 2026), ECF No. 216746. The voluntary dismissal of these high-profile cases was remarkable, and certainly would not have occurred without sign-off at the highest levels of the Justice Department. This was a sure sign that the government recognizes there is no merit to its appeal and, accordingly, no merit to the underlying EOs.

The next day, again without explanation, the government reversed course and filed a motion to withdraw its voluntary request for dismissal. *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-5241 (D.C. Cir. Mar. 3, 2026), ECF No. 2161832. This flip flop was, in our experience, unprecedented. There was only one person who could reverse the decision made by top officials at Justice to drop this appeal: the President himself. And, not surprisingly, it turned out that President Trump had in fact directly ordered the government's course correction. The President said that he "never signed off" on the voluntary dismissal, and the White House explained that

"[a]t the president's direction, the Department of Justice quickly amended this filing."[49]

Two lessons flow from this astonishing sequence. First, the government knows its appeal is baseless. It is clear that President Trump's lawyers thought the appeal should be dismissed because it lacks merit—or even is frivolous. In fact, the President himself has conceded that the law firm EOs were simple extortion. The President has boasted, "Lots of law firms have been signing up with Trump. They give you $100 million and then they announce that uh, 'But we have done nothing wrong.' *And I agree, they've done nothing wrong*. But what the hell, they give me a lot of money considering they've done nothing wrong."[50] President Trump would rather lose on appeal—and blame this Court, rather than his ill-advised EOs—than accept defeat.

Second, and relatedly, as all four district courts found, the EOs were acts of retaliation against President Trump's enemies. The government's flip flop shows that the President is ready and willing to continue his campaign of retribution against any law firm that crosses him if this Court gives him the slightest sanction. Pursuit

---

[49] *See* Josh Dawsey *et al.*, *Trump Ordered Justice Department Reversal on Law Firm Sanctions*, Wall St. J. (Mar. 11, 2026), https://www.wsj.com/politics/policy/trump-ordered-justice-department-reversal-on-law-firm-sanctions-f137f164?st=aJZYHP &reflink=desktopwebshare_permalink.

[50] White House, *President Trump Participates in an Unleashing American Energy Executive Order Signing Event*, https://www.youtube.com/watch?v=yGoDK8bVB9k*, supra* note 24.

of this appeal is a transparent attempt to maintain as long as possible the threat to law firms and their continued pro bono work with legal advocacy organizations. As Steven Banks, the former head of pro bono at Paul, Weiss, said, "Win or lose in court, the actions of the president are accomplishing their goal"—to coerce law firms into abandoning the values that underlie their pro bono and public-interest representations.[51] The fact that the Administration is pursuing this appeal confirms that the threat against law firms—and their pro bono partners like Common Cause— will remain until these cases are finally put to rest.

## CONCLUSION

This Court should affirm the district courts' judgments.

Dated: April 3, 2026

Respectfully submitted,

/s/ Gregory L. Diskant
Gregory L. Diskant
Margaret M. O'Neil
Basil J. K. Williams
Howard H. Kim
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
gldiskant@pbwt.com
moneil@pbwt.com
bwilliams@pbwt.com
hkim@pbwt.com

*Counsel for Amicus Curiae Common Cause*

---

[51] Spector, *supra* note 35.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type volume limitations of Rule 29(a)(5) of the Federal Rules of Appellate Procedure because it contains 6,481 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 32(e).  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

2.      This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: April 3, 2026                         Respectfully submitted,

                                             /s/ Gregory L. Diskant
                                             Gregory L. Diskant
                                             PATTERSON BELKNAP WEBB & TYLER LLP
                                             1133 Avenue of the Americas
                                             New York, NY 10036
                                             (212) 336-2000
                                             gldiskant@pbwt.com

                                             *Counsel for Amicus Curiae Common Cause*

30

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, I served a copy of the foregoing brief on all counsel of record via this Court's CM/ECF system.

Dated: April 3, 2026                    Respectfully submitted,

                                         */s/ Gregory L. Diskant*
                                         Gregory L. Diskant
                                         PATTERSON BELKNAP WEBB & TYLER LLP
                                         1133 Avenue of the Americas
                                         New York, NY 10036
                                         (212) 336-2000
                                         gldiskant@pbwt.com

                                         *Counsel for Amicus Curiae Common
                                         Cause*

31